OLE C. DRIVDAHL, Appellant, v. INTERNATIONAL HAR-VESTER COMPANY OF AMERICA, a Corporation, Respondent.

(174 N. W. 817.)

**Appeal and error — trial *de novo* — new trial ordered where record is too indefinite and unsatisfactory.**

Where a trial *de novo* is asked in the supreme court under the provisions of § 7846, Compiled Laws 1913, and the record is in such condition that the court finds it impossible to determine the matters submitted on account of the vague, indefinite, and unsatisfactory condition of the testimony, a new trial will be ordered in the district court.

Opinion filed July 22, 1919.    Rehearing denied September 8, 1919.

From a judgment of the District Court of Renville County, *Leighton*, J., plaintiff appeals.

Remanded for a new trial.

*H. S. Blood* and *J. E. Bryans*, for appellant.

*Bradford & Nash*, for respondent.

PER CURIAM. A survey of the record and the briefs in this case brings us to the conclusion that the only questions are questions of fact. While somewhat uncertain as to what the facts in the matter actually are, it seems to be a case where a district judge who had an opportunity to see the witnesses and observe the manner in which they gave their testimony is in an infinitely better position to determine the facts than are those who must gain their knowledge from the cold record. That being the case, while somewhat in the dark as to the facts, we are loathe to disagree with the findings of the trial judge. As we

look at the matter, and in so far as we are able to determine it, it stands as follows:

The action is one brought by Drivdahl to cancel and set aside a certain mortgage executed by him to the Harvester Company in September, 1914. The basis of the action, as set forth in the complaint, is a claim that the mortgage was secured by and through duress, to wit, a threat to institute a criminal prosecution on account of the selling of mortgaged personal property.

The answer admits the taking of the mortgage in question, denies that it was obtained by duress, sets out that it was obtained in due course of business to secure the indebtedness owing from plaintiff to defendant, and asks for affirmative relief in the foreclosure of the same.

The reply apparently abandons the theory of the complaint, and, admitting the execution and delivery of the mortgage, it sets out various matters and things in relation thereto. For defenses it alleges that the mortgage was executed by the plaintiff through misapprehension as to what it was and under the belief that it was an altogether different instrument; that the notes which it secures and certain other mortgages executed in connection therewith were made and executed by the plaintiff to the defendant in payment of a certain 40-horse power engine; and that the mortgage in question and certain other mortgages and notes were only executed by reason of, first, a warranty as to the character and quality of the engine, which wholly failed; and, second, that this mortgage in question and certain of the other ones were only executed by reason of the agreement and assurances on the part of the defendant company that the engine in question would be repaired and made fit and suitable for the purposes for which it was sold, and that this was not done.

The undisputed facts are that in the spring of 1911 plaintiff, through one Flem, a machinery dealer at Sherwood, North Dakota, who was selling International Harvester Company machinery, bought of the defendant company a 20-horse power tractor, which he used in 1911 and part of 1912; that in 1912 he was desirous of getting a large engine, and with that idea in view approached Flem and possibly others, relative to securing such an engine; that in the spring of 1912 one Sanderson, through Flem, bought of the defendant company a 45-horse power tractor, the tractor which is at the bottom of this litigation; that San-

derson used this engine in the spring and summer of 1912 for plowing; that in September, 1912, a deal was made by and between Sanderson and the plaintiff, Flem being present and taking part in the transaction, whereby the plaintiff took Sanderson's 45 tractor. Sanderson took the plaintiff's 20 tractor and the plaintiff executed and delivered notes, the notes which are in question in this particular lawsuit, directly to the defendant company.

Plaintiff contends that he made the trade with the defendant company through Flem. Flem contends that he simply acted as a go-between between the plaintiff and Sanderson. Sanderson testified that he made the trade with the plaintiff, but his testimony is very unsatisfactory and indefinite. In any event, the transaction was consummated, the plaintiff taking the 45, Sanderson the 20, with the understanding that if this was not satisfactory and could not be arranged to the satisfaction of the defendant company the deal was off.

Each party used the engine that he thus secured in the fall of 1912. In the spring of 1913 the plaintiff executed to defendant company at the suggestion of one Tice, collector of the defendant company, and in the office of Flem, mortgages covering a great deal of property, both real and personal, securing the note made at the time of the exchange of tractors in the fall of 1912, and at the same time plaintiff made his bill of sale to Sanderson for the 20 engine, and Sanderson made his bill of sale to the plaintiff for the 45 engine, each party taking their respective bills of sale.

Subsequently the plaintiff indorsed over to the defendant that certain chattel mortgage which the plaintiff sought to set aside in his complaint, which is the mortgage covering exactly the same property covered by the chattel mortgage executed in March, 1913, and in addition thereto, the crop to be grown on the land of the plaintiff in the year 1915.

In April, 1913, after the execution of the mortgages which were executed in March of that year, the repairmen of the defendant company made certain repairs to the 45 engine. The engine was used for a time and finally abandoned as being unworkable, and in October, 1913, the repairmen of the defendant company came to the premises of the plaintiff and hauled the 45 engine to the town of Sherwood, some 12 miles, where they claim to have made various repairs upon it. Plaintiff con-

tends that this was done without notice to him or without his knowledge, that no bills have ever been presented to him for any repairs that were so placed upon this engine, and that he was never advised that the same was repaired. When the engine was hauled to Sherwood it was placed in the yard of the man Flem, where it remained up to the time of the trial. There is no testimony in the record showing that any repairs were charged to the account of plaintiff either at the time of the repairing of the engine in the spring of 1913 or in the fall of 1913, nor is there anything in the record to show that he ever ordered or agreed to pay for any repairs, and it does appear that repairs of considerable value were placed upon the engine.

Furthermore, it does not definitely appear from the record where the 45 engine was at the time of the transaction relative to the trading of the engines, but a conclusion that this 45 engine was at that time on the premises of the man Flem, at Sherwood, might be warranted. Sanderson's testimony, as we have stated, is very hazy and indefinite. He has no clear recollection of the transaction involving some $3,000, cannot say who first broached the subject of a trade to him, doesn't know where his engine was at the time the transaction was made, and is a very unsatisfactory witness. We feel justified in concluding that the 45 engine was practically worthless at the time of the exchange of the engines, that it was never subsequently put in such a state of repair as to be of any particular value, and such was its condition at the time of the trial.

On the other hand, we also conclude that the plaintiff, Drivdahl, knew or should have known at the time he executed the mortgage in March, 1913, as to the state of the engine; that he knew or should have known what he was doing when he signed the mortgage in question; that subsequently when he turned over the note received in payment of the separator that he knew or should have known what he was then doing, and that such security was turned over as collateral to his note given to defendant company for the Sanderson engine, and that any payments made on account of it would be applied on such note; and that subsequently in 1914, when he signed the mortgage then executed by him, he did not sign it under duress, but he knew or should have known what he was doing, and the reason for the execution of the same; and that he then had knowledge that the engine was worthless.

Also, we find from the record that at the time the bills of sale were made and acknowledged that each party so signing such bills of sale knew what they were doing and the effect of what he then did.

On the other hand, while there is insufficient testimony to justify a positive finding, it would seem that the man Flem was the instigator of the transaction between Drivdahl and Sanderson, but we are warranted in inferring that various representations were made by him to Drivdahl to induce the latter to make the trade, and that probably these representations included representations as to the quality and character of the engine in question. The International Harvester Company, the defendant, did not authorize such representations, and they were contrary to and beyond any authority that Flem had from the company; nevertheless the defendant company accepted the notes and mortgages executed by Drivdahl on account of them and took the same in their own name. Thus, while the defendant company was not a party to the transaction directly, yet by reason of all the facts and circumstances Drivdahl might reasonably have supposed that it was a party to the transaction.

While it does appear in the record that as a consequence of the trade Sanderson did pay to defendant company a small balance or difference arising by reason of such trade, yet there is nothing to show that Sanderson subsequently executed new notes or new securities to the defendant company, or that the defendant company ever realized anything from Sanderson. We recall that on oral argument it was stated that Sanderson's payments had been sufficient to give him the 20 tractor clear.

Taking the whole matter from the record, as we read it, we cannot satisfactorily form any ultimate conclusions upon which to base a final judgment. Thus, while loathe to disturb the findings of the trial judge who had the advantage of noting the demeanor of the witnesses and of being better able to weigh their testimony and draw proper inferences therefrom, we feel that justice requires a new trial. Having hereinbefore set forth the principal features in which the record is unsatisfactory, it need only be added that, coupled with significant omissions from the testimony, there is an apparent ability to supply evidence that will take the place of inferences which are at best most unsatisfactory.

In these circumstances the judgment of this court must be that the

cause be remanded for retrial. Williams County State Bank v. Gallagher, 35 N. D. 24, 159 N. W. 80; Sutherland v. Noggle, 35 N. D. 538, 160 N. W. 1000. It is so ordered. The costs of the appeal will abide the event of the trial.

Robinson, J. (dissenting). This is an appeal from a rather drastic foreclosure judgment on notes and mortgages given by the plaintiff to defendant for a separator and two tractors. The plaintiff sued to cancel the securities and defendant obtained a foreclosure judgment for over $5,000. The deal commenced by the purchase of a 20 mogul tractor for $1,850, and a separator for $475; then a Titan tractor for $2,270. On the Titan tractor the mogul was taken in at a margin of $1,200, and notes were given for $400, $400, $270, in all, $1,070, making $2,270. It is conceded that on the first deal there was paid on the four notes given for the tractor and separator sums as follows: $217.74, $250, $87.70, and $271.10, amounting to $724.54. The contention relates mainly to the Titan tractor. It appears that this was no good; it was a worthless piece of junk. It was a damage to plaintiff. Defendants tried their best to make it work and failed. Then they took it to their yards, where they still have it, or had it at the time of the trial. The plaintiff refused to have anything to do with it. They first sold it to one Sanderson, who, it seems, had no use for it. Then they arranged with Sanderson to sell it, in his name, to the plaintiff, and in like manner they tried to arrange with the plaintiff to sell it, in his name, to some other party. Of course there was a direct conflict in the testimony, but there are facts in the case which speak louder than words. It is certain that in selling the tractor to the plaintiff that the defendants and Sanderson worked together. It is certain the Titan was no good, and one of the facts which bears most strongly against the defendants is the pains they took to make evidence in their favor and to weave a net around the plaintiff, and to hamper him with mortgages on every particle of his property,— his machinery, his crops, and his lands. On March 13, 1913, to secure $3,444, the Harvester Company took a real estate mortgage on a quarter section of land (S. W.¼ 8–162–85). On March 13, 1913, they took a mortgage on personal property described thus:

"One 45-horse power Titan gas tractor #TA354E, International

Harvester Company make; one bay horse 8 years old, weight 1,100 pounds, named Bill, valued $150; one sorrel mare 11 years old, weight 1,300 pounds named Beauty, valued $200; one black mare 4 years old, weight 1,100 pounds named Topsey, valued $250; one black horse 5 years old, weight 1,300 pounds named Prince, valued $250; one cow spotted red and white 8 years old, weight about 1,000 pounds; one wide tire Lake City wagon, complete with double box; one McCormick 7 ft. binder, complete with track, new 1911; one Racine separator 28x48, complete with main drive belt and all other belts, feeder, blower & weigher; one 580 galvanized oil tank for gasolene, complete with wagon gear, together with all increase of said live stock, and all repairs and supplies for the remainder of said property; also all wild and tame crops of every nature now growing or hereafter planted, sown or grown, cultivated or harvested during the year 1913 on the following described real estate situated in Renville county, State of North Dakota, more particularly described as follows, to wit: the southwest $\frac{1}{4}$ of section 8, township 162, range 85, also undivided $\frac{3}{4}$ interest in crop on east $\frac{1}{2}$ of the northeast $\frac{1}{4}$ of section 19, township 162, range 85."

On September 28, 1914, they took a mortgage on the same and some other property and on the crops to be grown during the year 1915 on the S.W.$\frac{1}{4}$ of Sec. 8–162–85 and the N.E.$\frac{1}{4}$ of 9–162–85. Under the crop mortgage they took the grain produced on the land, which was sold, and the proceeds, about $960, is held in a bank to satisfy the judgment. Plaintiff says: "They told me that if I did not turn the wheat over they would clean me out." (33) According to the testimony of plaintiff, the second and third mortgages were obtained by fraud and deception, and by threatening the plaintiff to send him over the road for selling a separator described in the first mortgage. The testimony is long and conflicting and covers 230 typewritten pages. It does show that the plaintiff was sadly overreached, and if he did knowingly give such mortgages he was a mere dolt who needed a guardian. However, we may rest the decision of the case on the fact that the Titan which defendant sold the plaintiff for $2,270 was mere worthless junk; that it was a damage to plaintiff while he experimented in trying to work with it. The notes given by plaintiff for that machine were dated September 6, 1912. They should be canceled and adjudged void, and on the same date the plaintiff should be given credit for $1,200, paid on the machine.

Then all payments which have been made should apply on the prior deal, that is, on the first four notes given for the mogul and the separator, and judgment should be entered in favor of the defendant for the balance due. The money in the bank, $960 more or less, will be at once applied on the same and on payment of the balance if any. The mortgages should be canceled and discharged. The judgment should be reversed and vacated. The plaintiff should recover costs and disbursements on this appeal.

Judgment should be entered accordingly.