[File No. 7225]

MARY ROVENKO, Peter Rovenko, Andrew Rovenko, Evelyn Neuman, Emma Rodier, Dena Semeniuk and Mary McTravis, Appellants, v. ALEX BOKOVOY, Respondent.

(45 NW2d 493)

Opinion filed December 30, 1950

*Halvorson & Halstead,* for appellants.

*O. B. Herigstad,* for respondent.

GRIMSON, J. The plaintiffs bring this action for an accounting by the defendant of what they claim to be a constructive trust.

In their complaint plaintiffs allege that the plaintiff, Mary Rovenko, is the widow of one Maxim Rovenko and that the other plaintiffs are their sons and daughters. That Maxim and Mary Rovenko had homesteaded a quarter section of land in Ward County, North Dakota, and later bought two additional 80 acre tracts of land in said county. That in 1918 they moved with their children to Canada and left the defendant, Alex Bokovoy, Mary Rovenko's half brother, as their agent to look after and care for said real estate. That he accepted said trust as agent and assumed the management and care of the property. That said land was encumbered but that said Alex Bokovoy, the defendant, retained all of the rents and profits of all the lands, together with $200.00 advanced by the plaintiff, Mary, in 1923 for the

payment of interest and taxes and for protecting the title. That Maxim Rovenko died July 29, 1923. That the plaintiffs reposed implicit confidence in the defendant and relied thereon. That they left the care of the property entirely with him. That they allowed the matter to run along for years in view of the indebtedness which had to be liquidated out of the rents and profits. That defendant failed to account. Instead when the plaintiff, Mary, came to North Dakota in 1944 she found that he had taken title to all the lands and sold all of them except the homestead. That he refused to account. Plaintiffs allege that the acts of the defendant were fraudulent and constituted a breach of trust and ask that he be required to account for the handling of the property and that the petitioner, Mary Rovenko, be adjudged the owner of the homestead.

The defendant admits that Maxim Rovenko was the owner of the lands described when he moved to Canada in 1918. That he died and that the plaintiffs are his widow and children. Defendant also admits that he looked after the lands upon the removal of Maxim and his family to Canada. As a defense he alleges that he accounted for the crops but that they were insufficient to pay the taxes and interest on the indebtedness so that the mortgages were foreclosed. That he then purchased the lands with his own money and became owner thereof. That in 1927 he offered to convey all the lands to the plaintiff, Mary Rovenko, upon her paying the defendant the amounts he had paid for the lands but that the plaintiff did not accept said offer. Defendant further alleges that he conveyed 80 acres of the land to plaintiff's brother, Steve Bokovoy, at her request. Finally, defendant alleges that any cause of action the plaintiff might have against the defendant accrued more than twenty years before the bringing of this action and is outlawed and barred by the statute of limitations.

Each of the parties offered evidence in support of the allegations of their pleadings. The main dispute in the evidence is whether plaintiff, Mary, after advancing $200.00 in 1923 to help pay what was due on the lands, came back in 1924 and was assured by the defendant that he was paying the interest and taxes

and everything was all right or whether she came back in 1927 and was told by defendant he had taken sheriff's deed to all the lands but that she could have them if she reimbursed him for the money he had advanced.

The evidence clearly shows not only the relationship of principal and agent between the Rovenkos and the defendant but also the close family relationship. The defendant was Maxim Rovenko's brother-in-law, the plaintiff, Mary Rovenko being the defendant's half sister. The evidence further shows that the defendant was a business man conducting both a wholesale and retail grocery business. The Rovenkos were farmers. Judging from the evidence of Mary, she had not much education nor experience in business matters. She clearly placed implicit confidence in her half brother. The relations thus existing were of the highest fiduciary nature. Of such relations Chief Justice Cardozo of the Court of Appeals of New York in Meinhard v. Salmon, 249 NY 458, 164 NE 545, 62 ALR 1, writes:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate."

Regarding such relations the following principles have been laid down:

"The law is also well settled that an agent will not be allowed to acquire rights adverse to those of his principal by failing to perform the duties which he owes to his principal; nor to use his position or knowledge obtained therein, to acquire interests adverse to his principal; and if he does so, he will be held to hold such rights or interests in trust for his principal." 1 Clark and Skyles on the Law of Agency (Obligations of Agent, Sec 415) p 932.

"In the absence of full knowledge and consent on the part of his principal, an agent may not acquire any right or title in the subject matter of the agency by the use of his position or any

information acquired by him during the course of his employment." 3 CJS (Agency, Sec 140) p 12.

The Rovenkos left in the care and control of the defendant, Alex Bokovoy, their 160 acre homestead and two separate tracts of 80 acres each. The evidence shows a first mortgage of $1500.00 on the 160 acre tract and a second mortgage of $150.00. It shows that on one 80 acre tract there was a first mortgage of $1000.00 and a commission mortgage of $100.00 and on the other 80 acre tract a first mortgage of $700.00 and a second mortgage of $105.00. All these mortgages were drawing 10% interest. That makes a total of $355.50 interest due every year. Apparently Maxim Rovenko came back in the fall of 1920 for the $700.00 mortgage is dated Nov. 22, 1920, and acknowledged by him in McLean County but by Mary in Alberta, Canada. The abstract also shows that at that time he paid off some mortgages. The inference is that he made a settlement of his current debts at that time.

The evidence further shows that on the 160 acre tract there were 148 acres cultivated at that time. On one of the 80 acre tracts about 70 acres and on the other about 75 acres, making a total of cultivated land upon the property of 293 acres. The defendant had all this land rented out. For some of these tracts he at times furnished the seed and paid one-half of the thresh bill and one-half twine and received one-half of the proceeds. One of the tracts he rented first for one-third net to the landlord in the elevator, later this was changed to one-fourth and finally all of the land was rented on the terms of one-fourth of the proceeds to the landlord.

From the proceeds of the crop, if sufficient, it was the duty of the defendant to pay the $355.50 interest and the taxes. In the statement, Exhibit 3, made by the defendant in 1929 he includes taxes for the two 80 acre tracts at $65.00 and taxes on the 160 acre tract for two years at $120.00 which would be $60.00 per year. At that rate the annual taxes on all of the land would be $125.00. The interest and taxes then would amount to approximately $475.50.

The defendant says he has no books and kept no account of

the crops but he admits that he had $300.00 for the crops on the 160 acre tract during 1923, the year of redemption. He further admits that he had $266.00 for the crops on the two 80 acre tracts during the year of redemption after their foreclosure. That would make an income of $566.00 per year. While the income would vary according to yields and prices, no showing is made in the evidence of different conditions prevailing in 1920, 1921 or 1922. If income of such amounts had been applied promptly on the payment of interest and taxes, he should have been able to keep the interest and taxes paid. He did succeed in having the $1500.00 mortgage on the 160 acre tract carried for four years after it was due.

The defendant, however, allowed a foreclosure to be had in March 1923 on the $150.00 second mortgage on the 160 acre tract for $120.00 due on principal and $10.23 on interest thereon and for $300.75 interest paid on the first $1500.00 mortgage. That means that the interest for 1921 and 1922 was allowed to remain unpaid. The 1923 crops on the 160 acre tract produced $300.00 which would have been sufficient to pay the interest and taxes thereon that year. No explanation is given by the defendant as to what happened to the crops raised on these lands in 1920, 1921 or 1922. One of the witnesses for the plaintiff, Arsen Sambor, testified that he asked the defendant in 1923 how the affairs of these lands stood. He claims the defendant showed him a book with the record of how matters stood and told him "I got enough money to pay from this crop he said to pay up the debts." Likewise, the plaintiff, Mary, testified that in 1924 defendant told her, "He pay interest and taxes and land in good shape." However, the defendant, in March 1923, took an assignment of the Sheriff's Certificate to himself on the day of the foreclosure sale and on April 3, 1924, obtained the sheriff's deed under which he now claims. In similar manner he secured a sheriff's deed to one 80 acre tract on March 22, 1924. Both those foreclosures were in 1923 and before Maxim died. On the other 80 acre tract he secured a sheriff's deed on May 21, 1927.

Somewhat similar circumstances existed in the case of Van Alstyne v. Brown, 77 NJ Eq 455, 78 Atl 678. Mrs. Brown was

the executor of her husband's estate. The will directed the payment of his debts and that thereafter Mrs. Brown should have the net income during her lifetime. Among the debts was a $3500.00 mortgage on some real estate. That was foreclosed, if not at the instance of Mrs. Brown, then by her permission and she acquired title through that foreclosure. Of that the court says:

"Independently of the question of the extent to which Mrs. Brown may have induced the foreclosure in her own behalf, I think it clear that she occupied a position which rendered it impossible for her to become a purchaser of the property at the sale, and thereby hold the title adversely to the devisees named in the will of her husband. She had accepted the provisions of the will which directed that the income of the estate be applied to the payment of debts and that no part of the real estate should be sold, and which gave to her the income, after the debts should be paid, in lieu of her dower, and she was in possession of the real estate under and pursuant to these testamentary directions. It was her primary duty to prevent a foreclosure, if possible. If a mortgagee desired payment of the mortgage in question, and the income was presently insufficient for that purpose, it became her duty to search for an assignee of the mortgage who would not require immediate payment or to devise some other means, if possible, to defer the demand for immediate payment; for the property covered by the mortgage was worth much in excess of the incumbrances against it, and its revenues were far in excess of the amount necessary to pay interest and maintenance charges. In the event of it becoming impossible for her to defer a foreclosure, it became her primary duty to see that at a foreclosure sale the full value of the property was realized, if possible. In accepting duties of this nature under her trust, she denied to herself the privilege of becoming a purchaser of the property; for as a prospective purchaser. her interests would necessarily be to induce a sale and to purchase at the smallest possible price. When such private interests and trust duties conflict in a single person, it is the defined policy of the law to set aside, in behalf of the beneficiaries of the trust, all transac-

tions whereby the trustee has acquired title to a property over which the trust duty extended. Even though it may be found that the transaction has been without thought of wrong and beneficial to the beneficiary under the trust, public policy requires that the transaction be held to be voidable at the instance of the cestui que trust; for the defined policy of the law arises from the necessity of removing temptations for self-gain from all persons having trust duties to perform. Stewart v. Lehigh Valley R. Co. 38 NJ Law, 505."

The same reasoning may well be applied to the case at bar. The defendant's duties were the same as those of Mrs. Brown. The same principles of law are applicable.

In the beginning the defendant may have been carrying on in this manner in good faith. He may have reasoned that it would be easier for him to administer the trust if the title were in his name. There would be much less trouble in the renewal of mortgages. This foreclosure procedure might avoid probate of the estate of Maxim Rovenko. If that presumption is indulged in then he was taking legal title to the property in his name for the benefit of the Rovenkos. There is some evidence to sustain that. Sambor testified that defendant in 1923 showed him the books showing everything in good standing for the Rovenkos. The plaintiff, Mary Rovenko, claims that he told her when she was there in 1924 and after he had taken title to the 160 acre tract that he was taking care of the matter for her and that everything was all right. Sometime later he sent her Exhibit 3. There is some dispute as to when that was sent to her but the date on the statement while not specifying the day or month is clearly 1929 and the amounts show it was made out after he took title to all the lands. That exhibit is in the defendant's own handwriting and in the Russian language. His translation thereof is as follows:

"Note given for 80 acres with buildings to bank,     1187.

Note given for 80 acres by somebody else, neighbor, for   1075.

I put my own money in,     144.08

Interest till fall for the two 80 acres     100.10

The taxes for the two 80's     65.00

    2571.18

Loan against the Sec. 32 (160 acre tract)     1500.00

Interest for two years,     180.00

Interest on interest     10.00

Taxes for two years,     120.00

    1810.00

Altogether     $4381.18

To Steve Bokovoy,     200.00

    4581.18"

It will be noticed that this is a statement of the indebtedness against the land including the $200.00 Mrs. Rovenko had sent Alex by her brother, Steve Bokovoy. The defendant does not claim in this statement that the property is his. The only claim of the defendant to an interest in the land in this statement is that he paid his own money, $144.08. His translation of Exhibit 3 indicates he carried the indebtedness in the bank by notes. When he sold the 80 acre tract to Steve Bokovoy he had Steve pay by taking up the notes at the bank. There may have been some liability on the defendant for these notes but that was primarily as agent for the Rovenkos for he testified that everyone knew he was acting for them. Even his claim that he told the plaintiff, Mary Rovenko, that he would deed the lands to her if she paid what he had in them does not contradict the conclusion that he was holding this land in trust for her.

Either he was doing that or his acts in taking title in his own name were in violation of his duties as agent for the Rovenkos.

In the case of McDonald v. Miller, 73 ND 474, 16 NW2d 270, 156 ALR 1328, this court holds that:

"A constructive trust will be imposed by the courts in order

to do equity and prevent unjust enrichment when title to property is acquired by fraud, duress, undue influence or is acquired or retained in violation of a fiduciary duty." See also Hanson v. Svarverud, 18 ND 550, 120 NW 550; Hughes v. Fargo Loan Agency, 46 ND 26, 178 NW 993.

In the case of Cardiff v. Marquis, 17 ND 110, 114 NW 1088, this court quotes with approval, Perry on Trusts, Sec 166 as follows:

"If a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience, as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party, and will convert him into a trustee of the legal title, and order him to hold it or to execute the trust in such a manner as to protect the rights of the defrauded party and promote the safety and interests of society."

In Dorman v. Crooks State Bank, 55 SD 209, 225 NW 661, the court holds:

"An agent will not be allowed to acquire rights adverse to those of his principal by failing to perform duties owed to latter, and will be held to hold rights or interests so acquired in trust for principal."

The following sections of our Code are applicable to the situation at bar:

"Section 59–0108 NDRC 1943: "Everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee within the meaning of this chapter not only as to the person who reposes such confidence, but as to all persons whose affairs he thus acquired information which was given to such person in the like confidence, or over whose affairs he, by such confidence, obtains any control."

Section 59–0109 NDRC 1943: "In all matters connected with

his trust, a trustee is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind."

Section 59–0110 NDRC 1943: "A trustee shall not use or deal with the trust property for his own profit or for any other purpose not connected with the trust. If he does so, he at the option of the beneficiary, may be required to account for all profits made thereby, or to pay the value of the use of the trust property, and, if he has disposed thereof, to replace it with its fruits or to account for its profits with interest.

Section 59–0111. "Neither a trustee nor any of his agents may take part in any transaction concerning the trust in which he or anyone for whom he acts as agent has an interest, present or contingent, adverse to that of his beneficiary, except as follows:

1. When the beneficiary, having capacity to contract, with a full knowledge of the motives of the trustee and of all other facts concerning the transaction which might affect his own decision and without the use of any influence on the part of the trustee, permits him to do so."

The defendant makes a broad statement that he kept plaintiff, Mary, informed and that she knew everything that was done up to 1927. She just as definitely denies that. The nature of the relationship, the manner of carrying on the agency and all the circumstances of the case corroborate her testimony rather than his. The defendant's claim that plaintiff, Mary, knew he was claiming the property as his own is not supported by clear and convincing evidence. The evidence warrants the imposition of a constructive trust upon the property involved for the benefit of the plaintiffs.

The defendant, however, claims that any cause of action the plaintiffs may have had against the defendant for the violation of his trust accrued more than twenty years ago and is, therefore, barred by the statute of limitations. The basis of that claim is the following conversation defendant claims to have had with the plaintiff, Mary Rovenko, in 1927:

"Q.—What was that talk?

A.—When she came to my house, like sister, you know, explain her, tell her about the land, shape now, what condition, I told her 'Mary, if you want sell this land to people, release me from debts which I have debts on, I offer her land.'

Q.—You offer her the land back?

A.—Yes.

Q.—If she would pay you the money you had in it?

A.—As much as I paid for it, no profit, as much as I paid in money.

Q.—Yes?

A.—Yes, I done it.

Q.—What did she say on that?

A.—Why she didn't say much, about this deal, she can't pay she can't take care of it.

Q.—And did she ever offer to pay you the money you had in this land?

A.—Did she offer me?

Q.—Yes?

A.—No.

. . .

Q.—But you told her in 1927 that you had taken title to the land?

A.—Explain her how the condition in the land and say her, Mary, you go sell the land, release me from the money, I borrow, and my money.

Q.—That you put into it?

A.—That I put it in, yes, I offered her land that year, yes, take it."

The question arises whether on this testimony of the defendant that conversation amounts to a claim of ownership of the property by the defendant hostile to that of the plaintiffs so that his occupation of the premises thereafter did amount to adverse possession on which the twenty year statutory limitation would run.

In Lindokken v. Paulson, 224 Wis 470, 272 NW 453, it is held that:

"The law is very rigid with respect to the fact that a use permissive in the beginning can be changed into one which is hostile and adverse only by the most unequivocal conduct on the part of the user. The rule is that the evidence of adverse possession must be positive, must be strictly construed against the person claiming a prescriptive right, and that every reasonable intendment should be made in favor of the true owner." See cases cited.

"Possession without hostility affords no basis for title by adverse possession however long continued, or exclusive in character, and possession consistent with the real owner's title cannot be regarded as adverse." 2 CJS (Adverse Possession, Sec. 53) p 570. See also 5 Thompson on Real Property (Adverse Possession, Sec 2648) p 459.

The evidence shows that this property was held by the defendant under a constructive trust for the plaintiffs. Such a holding cannot become adverse or prescriptive unless the defendant asserted ownership of the property in hostility to the plaintiffs and to their knowledge. This conversation under which defendant claims he informed the plaintiff, Mary, of his claim of ownership does not definitely and clearly do that. When directly asked by his counsel if he told her he had taken title to the land he answered to the effect that he explained to her the condition of the land as to indebtedness and told her she could sell the land to release him from his liability and give him back his advancement. That amounts to a recognition on his part that she was entitled to the lands upon releasing him from his liabilities in connection therewith and upon payment of what defendant had advanced of his own money. It is a claim of security in the land rather than a claim of ownership. He had a right to hold the property as security until his claims were satisfied. 2 Scott on Trusts (Administration of Trusts, Sec 244.1) p 1409; 2 Restatement of the Law of Agency, Sec 464, p 1085. His claim in that conversation was not inconsistent with his rights of holding the property as security for his expenses and fees subject to plaintiffs' ownership. The evidence must be strictly

construed against the defendant and that construction of the testimony adopted which favors the true owners. Lindokken v. Paulson, supra. The construction of the conversation as a claim for security is in accordance with these principles.

"To be adverse, so as to vest title after the lapse of the statutory period, possession must be hostile and under claim of right, actual, open and notorious, exclusive, continuous and uninterrupted. All of the elements must exist and concur." 2 CJS (Adverse Possession, Sec 8) p 520.

The evidence does not show such open claim of right or exclusive possession. Defendant admits everyone knew he was acting for Rovenko in looking after the property. There is other evidence to that effect. Furthermore, if the contention of the plaintiff, Mary, is correct that she never had any such conversation with him; that in her last conversation with him in 1924 he assured her that everything was all right, then she was never informed that defendant was claiming ownership of the property hostile to her.

In Morgan v. Jensen, 47 ND 137, 181 NW 89, this court holds that the burden of proving adverse possession by "clear and convincing" evidence is on the person alleging it. See also Horton v. Smith-Richardson Inv. Co., 81 Fla 255, 87 So 905. The defendant has failed to do that.

In 2 Scott on Trusts (Administration of Trusts, Sec 219.1) p 1167, it is said that:

"A beneficiary does not lose his interest in the trust property merely because of a lapse of time, however great; the mere failure of the trustee to perform the trust and the failure of the beneficiary to compel him to perform it do not terminate the trust by extinguishing the interest of the beneficiary."

The holding of this court is, therefore, that the defendant since taking title to the Rovenko property in his own name has been holding it, and the proceeds thereof in trust for the plaintiffs.

The defendant has sold the two 80 acre tracts. The plaintiffs do not question those sales. By suing for an accounting

on those sales they confirm them. The 160 acre tract the defendant is still holding in his name.

In their complaint plaintiffs ask that this 160 acre tract of land still remaining in the trust, described as East Half (E½) the Northeast Quarter (NE¼) Northwest Quarter of the Northeast Quarter (NW¼NE¼) and the Northeast Quarter of the Northwest Quarter (NE¼NW¼) of Section Thirty-two (32), Township One Hundred Fifty-one (151) North, Range Eighty-three (83) in Ward County, North Dakota, be decreed to Mary Rovenko as her homestead. That cannot be done. While this land was a Government homestead and was occupied by the Rovenkos as their home until they moved to Canada in 1918, they at that time abandoned it as a home and neither they nor their children have ever so occupied it since that time. Mary, therefore, has no special interest in that land as a homestead. On the death of Maxim Rovenko his interest in that land passed to the plaintiffs in the proportions designated by law.

The defendant is in duty bound to account for the proceeds of the sale of the two 80 acre tracts, and for the proceeds he has received from crops of all the lands from the beginning of his agency to the present time.

The evidence on the accounting given at the trial in district court is very unsatisfactory. The defendant was subpoenaed to bring into court his books and records on these matters, but he failed to do that. He indicated that he could make some report if required and given time. In this present action the defense presented was the statute of limitations. The necessity of an accounting depended on a ruling thereon. The arguments on that may have had an effect on the presentation of the evidence and caused the failure to give the defendant more time to produce a report. Now that issue has been decided and the accounting is the only matter remaining in the lawsuit. That may show money coming to the plaintiffs after the indebtedness against the land, taxes and expenses have been satisfied or it may show money owing to the defendant for which he may hold the land as security until paid.

On the accounting the evidence is incomplete and indefinite.

The district court made no findings thereon. The record is not in such shape that this court can make any sound determination thereof.

In the case of Landis v. Knight, 23 ND 450, 137 NW 477, this court held that the Supreme Court on all appeals of cases tried to the court without a jury may "if it deems such course necessary to the accomplishment of justice, order a new trial of the action."

The case of Sutherland v. Noggle et al. 35 ND 538, 160 NW 1000, was remanded for a new trial on a single issue which the court held it could not determine because of the unsatisfactory state of the evidence on that issue.

In the case of Remmich v. Wagner, ante, 120, 41 NW2d 170, a single, separate issue was remanded for a new trial because of the meager and indefinite state of the evidence on that issue. See also Williams County State Bank v. Gallagher, 35 ND 24, 159 NW 80; Sutherland v. Noggle, 35 ND 538, 160 NW 1000; Drivdahl v. International Harvester Co., 43 ND 284, 174 NW 817; King v. Tallmadge, 45 ND 530, 531, 178 NW 280; McLean v. McLean, 51 ND 309, 199 NW 872; County of Hettinger v. Trousdale, 69 ND 505, 288 NW 25; Bredeson v. Warren, 73 ND 760, 19 NW2d 652.

This court deems that because of the unsatisfactory condition of the evidence on the accounting the interest of justice can best be served by remanding the matter of the accounting to the district court for a new trial, and it is so ordered.

The judgment appealed from is reversed and the case remanded to the District Court with directions to render judgment in accordance herewith.

NUESSLE, Ch. J., and CHRISTIANSON, MORRIS and BURKE, JJ., concur.