**ELLISON et al. v. STRANDBACK et al.**

No. 7339.

Supreme Court of North Dakota.

Dec. 19, 1953.

Rehearing Denied Feb. 3, 1954.

J. K. Murray, Bismarck, for appellants.

Sullivan, Kelsch & Scanlon, Mandan, for respondents.

BURKE, Judge.

This is an action to quiet title to a tract of land in Morton County. Plaintiffs, the heirs at law of John A. Ellison, alleged in their complaint that the said John A. Ellison, during his life time, acquired title to the described property by adverse possession and that upon his death title to such property passed to them by inheritance. The defendants, in their answer and counterclaim, deny that John A. Ellison ever occupied the described land adversely and allege that each of them and the deceased John A. Ellison acquired an undivided one-tenth interest in said land by inheritance from their father, John Ellison, Sr., that they and each of them are still possessed of their respective interests in said land and that the interest of the deceased John A. Ellison has passed to his heirs at law, the plaintiffs in this action. They asked that title be quieted as to their respective interests. The trial court found in favor of the defendants and judgment was entered accordingly. The plaintiffs have appealed from the judgment and have demanded a trial anew in this court.

John Ellison, Sr., died intestate in 1922. At the time of his death he was the owner of the land in controversy. He was survived by ten children, four daughters and six sons. Nine of these children are defendants in this action, the other was John A. Ellison, deceased. At the time of the death of John Ellison, Sr., John A. Ellison, the youngest son, was the only one of the children who lived at home. Thereafter he continued to live at and operate the farm home. In 1923 he married the plaintiff, Josephine Ellison, and he and his wife lived upon and farmed the said land until July 1950, when John A. Ellison died. After the death of her husband Josephine Ellison continued to reside upon the land until October, 1950, when she surrendered possession of it to the administrator of the estate of John Ellison, Sr.

The defendant, W. P. Ellison, was appointed as administrator of his father's estate. Letters of Administration were issued to him on January 28, 1926. The estate of John Ellison, Sr. has never been closed and said Letters of Administration are still in full force and effect. On May 8, 1928, W. P. Ellison, Administrator, filed a Final Report and Accounting and Petition for Distribution. The petition asked that an undivided one-ninth interest in all the real and personal property be distributed to each of the heirs. Citations hearing this petition were served upon all of the heirs by registered mail. Some of the heirs made objections as to the allowance of certain items in the account, but no objections or claims of any nature were made by John A. Ellison. On August 22, 1928, the County Court entered an order approving the final account with certain exceptions but directed that the estate be not closed until certain specified debts were paid. Among the receipts listed by the administrator in this report were rentals of the farm land for the years 1922 to 1927 inclusive, upon a one-half crop share basis.

Prior to his death John Ellison, Sr., had mortgaged a large part of the described lands to the State of North Dakota (Board of University and School Lands). After his death his heirs defaulted in the payment of interest on the mortgage and taxes on the land. The mortgagee paid the taxes from 1921 to 1928 inclusive. In 1929 there was due on the mortgage for principal, interest and taxes the sum of $5,600.00 and foreclosure proceedings were in progress.

W. P. Ellison, administrator, in order to make a redemption, from the foreclosure sale, petitioned the County Court of Morton County for leave to mortgage the land. A citation hearing said petition was served upon all the respondents, including John A. Ellison, by registered mail. John A. Ellison, entered no objections to the mortgaging of the land. The petition was allowed and the loan with the state land department was refinanced by the execution of a new mortgage for $5,000.00 by W. P. Ellison, administrator, and the state executed a quit claim deed to the land to W. P. Ellison, administrator, on April 5, 1930, as evidence of the redemption which had been made.

Thereafter and until he died John A. Ellison made all of the interest payments due on the mortgage to the state and paid all the taxes, including those for the year 1929. Receipts for the payments of interest were made out to W. P. Ellison, administrator, and with but two or three exceptions the tax receipts were made out to W. P. Ellison, administrator, by John A. Ellison. From 1928 until he died John A. Ellison farmed the land and, with the exception of the payments above named, he retained the proceeds of all of the farm produce for his own use. Sometime between 1935 and 1940 he built a new cattle barn on the farm. He put a new roof on the house in 1949 and at some time not disclosed by the evidence put new curbing in the well.

In 1941, when John A. Ellison was a county commissioner, he entered into a contract with Morton County on behalf of his brother W. P. Ellison, administrator, for the payment of delinquent taxes. The contract recites that the contracting parties are W. P. Ellison and Morton County. John A. Ellison signed his brother's name thereto. Sometime after 1940, John A. Ellison listed the land in question with the triple "A" now the Production and Marketing Administration. This listing shows John A. Ellison as the operator of the land and John Ellison Estate, W. P. Ellison, administrator, as owner.

In 1949, John A. Ellison executed an oil and gas lease which purported to lease the whole of the land. He also insured the buildings on the farm and paid the insurance premiums. The earliest policy of insurance produced was dated in 1946.

After the death of her husband, the plaintiff, Josephine Ellison filed a verified petition in the County Court of Morton County for the probate of John A. Ellison's estate. In this petition she alleged that her deceased husband at the time of his death owned an undivided one-tenth interest in the land to which title is here contested.

As related so far the facts are undisputed or are established by documentary evidence. Other facts, depending upon the uncorroborated testimony of witnesses, are in dispute. Among these witnesses are the plaintiff Josephine Ellison and the defendant W. P. Ellison. The testimony of each of them was objected to as being incompetent under the provisions of Sec. 31–0103, NDRC 1943, the so called "dead man's statute." This statute provides:

"In any civil action or proceeding by or against executors, administrators, heirs at law, or next of kin in which judgment may be rendered or ordered entered for or against them neither party, except as provided in section 31–0104 and section 31–0105, shall be allowed to testify against the other as to any transaction whatever with or statement by the testator, or intestate, unless called to testify thereto by the opposite party. * * *"

This is clearly an action by the heirs at law of John A. Ellison, in which a judgment may be rendered for or against them. All parties to the action are therefore barred from testifying unless they come within one of the exceptions noted. Section 31–0104, NDRC 1943 provides:

"In any action or proceeding by or against any surviving husband or wife touching any business or property of either, or in which the survivor or his or her family is interested in any way,

such surviving husband or wife, if he or she shall so desire, shall be permitted to testify under the general rules of evidence as to any or all transactions and conversations touching such business or property had with the deceased husband or wife."

This section clearly exempts the plaintiff Josephine Ellison from the ban imposed by Sec. 31-0103 supra. The action is by a surviving wife. It touches property in which she is interested and she therefore was not barred from testifying as to any transactions or conversations had with her deceased husband concerning property. Sec. 31-0105, relates to cases where the testimony of a deceased person has been taken prior to his death and preserved. It does not in any way relieve W. P. Ellison or any of the other parties to the action from the disability to testify imposed by Sec. 31-0103. It follows that the testimony of Josephine Ellison may be considered while that given by W. P. Ellison must be disregarded in so far as it relates to conversations or transactions with the deceased.

Josephine Ellison testified that within a week or two after she married John A. Ellison, he told her that the farm had been given to him by his father and that he told her at least twice a year that the farm was his. Two other witnesses for the plaintiff testified that John A. Ellison made statements wherein he stated positively or intimated that the land was his. John Handtman testified that in the spring of 1950, Ellison told him "I own all of it. It's all mine." Steve Tokatch testified that several times between 1947 and 1950 Ellison mentioned to him that "he was going to pay his taxes."

Steve Brigl, witness for the defendant, testified that between 1928 and 1938 he was present on several different occasions at conversations between W. P. Ellison and John A. Ellison and that the subject of such conversations was the leasing of the farm. He told of a conversation concerning the oil lease that John A. Ellison had given in 1949, and stated that John said, "I told them I was just an heir, I just had one-tenth interest in there," and that he signed the lease "just to get rid of them." He also related a conversation had with John A. Ellison after the house on the farm had been reshingled in 1949. This testimony is as follows: "and then we discussed about painting the building on the outside and he said that is too much. The estate can't stand this much and I said 'Well put siding on it' and he said 'The paint runs into too much money, but we might put on some fancy siding, but they don't need painting, but I will talk it over with the administrator to see whether he allows it or whether he can do this work." Defendant's witness, C. F. Kelsch, testified that in April 1933, John A. Ellison paid him $320.00 for his services in representing W. P. Ellison, administrator.

The question for decision is whether this record shows open, notorious and hostile possession of the land in question, by John A. and Josephine Ellison for twenty years prior to the time Josephine Ellison surrendered possession of the land to W. P. Ellison, administrator in October 1950.

Upon the death of John Ellison, Sr., his ten surviving children each succeeded to a one-tenth interest in the land and estate owned by him at the time of his death. NDRC 1943, Sec. 56-0104. They succeeded to the title to the real property as tenants in common. Stevahn v. Meidinger, N.D., 57 N.W.2d 1. As to co-owners of real property each had a right to enter upon the common estate and take possession of the whole thereof, subject only to the equal rights of his companions in interest. Stephan v. Meidinger, supra. Possession by one cotenant is consistent with the record title and is presumed to be subordinate to the rights of all other cotenants. Ildvedsen v. First State Bank Bowbells, 24 N.D. 227, 139 N.W. 105. Before possession, of one cotenant can become adverse, the cotenant in possession, must give notice to the other cotenants, either directly or by a course of conduct in direct hostility to their claims

so as to show an ouster of the rights of such cotenants. Stoll v. Gottbreht, 45 N.D. 158, 176 N.W. 932.

Here there is no claim that John A. Ellison ever gave direct notice to his cotenants that he made any claim adverse to their interests. The contention is that the character of his possession was such that it gave notice to his cotenants that their title was not acknowledged and that his possession was adverse to them.

■ The burden was upon the plaintiff to establish adverse possession for the statutory period by clear and convincing evidence. Rovenko v. Bokovoy, 77 N.D. 740, 45 N.W.2d 492; Morgan v. Jenson, 47 N.D. 137, 181 N.W. 89.

Here there can be no doubt, that the occupation and use of the land by plaintiff's husband was in the beginning permissive and not adverse to his cotenants. There was testimony by the plaintiff to the effect that her husband, in 1923, told her that his father had given him the land and that it was his. This testimony is not convincing. Her husband's behavior at that time and for several years afterwards was wholly inconsistent with any such claim. The record shows that the administrator of the estate of John Ellison, Sr., collected rent on this land upon a half crop rental basis as follows: 1922, $322.00; 1923, $844.76; 1924, $1212.27; 1925, $915.13; 1926, $504.50; 1927, $1071.19. The payment of these rentals is directly at odds with any claim on the part of John A. Ellison and that the land was his.

■ Possession, which is permissive in its inception can become adverse only where there is a disclaimer of the true owner's title, or there are acts of such an unequivocal nature on the part of the user, that notice of the hostile character of the possession is brought home to the record owner. Rovenko v. Bokovoy, 77 N.D. 740, 45 N.W.2d 492; Lindokken v. Paulson, 224 Wis. 470, 272 N.W. 453, 110 A.L.R. 910.

It is undisputed that plaintiff surrendered possession of the land to W. P. Ellison, administrator, in October 1950. In order to prove title by adverse possession she must therefore show that the possession of the land by her deceased husband became adverse to his cotenants not later than 20 years prior to October 1950 or not later than October 1930 and remained continuously hostile and adverse thereafter. Since the record shows permissive occupation of the land through the year 1927 and since there is no evidence of any declaration to any of his cotenants by the user that he made any claims adverse to their interests, the question is "Did the plaintiff's husband between January 1, 1928 and October 31, 1930 do or perform any acts of such a nature that they would give notice to his cotenants, that he claimed to hold adversely to them?"

The acts relied upon by plaintiff are the payment of taxes, the payment of interest on the mortgage and the taking of the entire crops from the land. With respect to taxes the record shows that four-fifths of this land was mortgaged to the State of North Dakota; that none of the heirs of John Ellison, Sr., paid any taxes on the mortgaged land until after 1928, but that such taxes were paid by the state land department. The record also shows that the 1929 taxes were paid by John A. Ellison and that the tax receipt was issued to W. P. Ellison, administrator, on October 1, 1950. No other taxes were paid on the land until 1936 when the taxes for the year 1930 and subsequent years were paid. The record also shows that no interest on the mortgage was paid until January 25th, 1940. It is conceded that John A. Ellison took whatever crops there were in the years 1928, 1929 and 1930.

■ We very seriously doubt if the taking of the crops in the years 1928, 1929 and 1930, and the payment of the 1929 taxes without any demand that the tax receipt be issued in the name of the payer, would, standing alone, be sufficient to give notice that the permissive possession by one of several cotenants had become adverse to the others. However, the record shows other acts and omissions on the part of John A. Ellison during this period which are wholly

inconsistent with hostile possession on his part. In May 1928, W. P. Ellison filed a final accounting and petition for distribution in the estate of John Ellison, Sr. This petition proposed to divide his estate equally among all the heirs of John Ellison, Sr. The hearing on the petition was set for June 16th 1928. John A. Ellison although present at the hearing entered no objections to the proposed distribution. In October 1929 the administration petitioned the county court for license to mortgage the land. The hearing on this petition was had on November 7th, 1929, and John A. Ellison entered no objections to the allowance of the petition. The witness, Brigl, testified that John A. Ellison was present at the hearing upon the petition for distribution and that at that time he heard a conversation between John A. Ellison and the administrator in which they discussed the terms upon which John A. Ellison was to continue to rent the land. Brigl testified as to another conversation between the administrator and John A. Ellison which took place either in 1930 or 1931 and in which the subject of the conversation was the leasing of the land. These acts and omissions directly or indirectly acknowledge that the title to the property was in the heirs of John Ellison, Sr. They completely nullify any possible inferences of hostile possession that might have been drawn from the fact that the cotenant in possession took the crops raised during the three year period. It is our view therefore that the evidence not only fails to show a hostile possession at this time but affirmatively shows that the possession of the land continued to be permissive in character at least until after October 31st, 1930.

This finding disposes of this law suit. The statute of limitations would not commence to run, where the original entry was permissive, until the owners knew the person in possession asserted a hostile claim. McKnight v. Basilides, 19 Wash.2d 391, 143 P.2d 307; Keller v. Harrison, 151 Iowa 320, 128 N.W. 851, 131 N.W. 53; Ann Arbor Fruit & Vinegar Co. v. Ann Arbor R. Co., 136 Mich. 599, 99 N.W. 869, 66 L.R.A. 431. Since a hostile claim was not asserted by word or deed prior to October 31, 1930, the adverse possession, if any, thereafter, by plaintiff and her husband did not continue for the full statutory period of twenty years and was insufficient to bar the defendants from asserting title to the land. J. B. Streeter, Jr., Co. v. Fredrickson, 11 N.D. 300, 91 N.W. 692; Walker v. Sorenson, 64 S.D. 143, 265 N.W. 589. It follows that the decision of the district court dismissing this action was correct.

While it is not necessary to a decision in this case we think it proper to comment upon the evidence as to the character of the possession by plaintiff and her husband in 1931 and subsequent years. The acts of the plaintiff's husband during this time, in paying all the taxes, all the interest on the mortgage loan, taking all the crops, building a cattle barn, making repairs on the house and well and paying for insurance on the buildings are all consistent with an adverse holding on his part. During this time, however, there are other acts on his part which either directly or indirectly recognize the title of his cotenants. In paying the taxes and interest he never demanded that the receipts be made to him personally but accepted receipts showing payment by W. P. Ellison, administrator. In 1933, he paid an obligation of the estate of John Ellison, Sr. He listed the land with the Production and Marketing Association and named W. P. Ellison, administrator, as owner and John A. Ellison as operator. In 1941, while a county commissioner he entered into a contract with the county for payment of delinquent taxes. This contract was executed in the name of W. P. Ellison and John A. Ellison affixed W. P. Ellison's name thereto. There is testimony that John A. Ellison between 1947 and 1950 told two people that the land was his. On the other hand the witness Brigl testified that in 1949, plaintiff's husband told him he was going to take up with the administrator the matter of having the house on the farm painted or re-sided and see if the estate could afford to have the work done. Brigl

also said that when, in 1950, he complained that plaintiff's husband had given an oil lease without authority he said, "I told them I just had one-tenth interest."

 Taking all of the evidence together we do not believe that it is sufficiently unequivocal, clear and convincing to establish that John A. Ellison, at any time, possessed the land in hostility or adversely to his co-tenant brothers and sisters.

The judgment of the district court is affirmed.

MORRIS, C. J., and GRIMSON, CHRISTIANSON and SATHRE, JJ., concur.