IRBY v. IRBY.

5-1036                                    295 S. W. 2d 634

Opinion delivered November 12, 1956.

[Rehearing denied December 10, 1956.]

*Spencer & Spencer* and *Wright, Harrison, Lindsey & Upton,* for appellant.

*L. B. Smead, Walter L. Brown* and *Robert C. Compton,* for appellee.

SAM ROBINSON, Associate Justice. There are two points here. First, there is the question of whether an instrument which appears to be a deed on its face is, in fact, a mortgage. And second, if the instrument is a deed, as it appears to be, has the grantor reacquired the property by adverse possession?

The appellant, W. W. Irby, and the appellee, F. L. Irby, are brothers. We will hereafter refer to appellant as Walter and to appellee as Frank. They live in Union County. Frank is a doctor and Walter is a small farmer. Walter owned a 220 acre farm on which he cultivated about 67 acres. In 1923, a mortgage on the farm had matured, and the bank was threatening foreclosure. Walter gave to Frank what appears on its face to be a deed. In 1954, Walter filed this suit to quiet title in him, contending that the instrument he executed and delivered to Frank in 1923 is, in fact, a mortgage, and also claiming the property by adverse possession. There was a decree in favor of Frank, and Walter has appealed. There is no serious controversy between the parties as to the law. Both sides recognize that, to prove an instrument which appears on its face to be a deed is, in fact, a mortgage, the evidence must be clear, cogent and convincing. *Burns* v. *Fielder,* 197 Ark. 85, 122 S. W. 2d 160. *Grimes* v. *Evans,* 225 Ark. 770, 285 S. W. 2d 510.

Walter contends that in 1923, when the debt to the bank in the sum of $2,260.62 became due, the property was worth more than the indebtedness, and that he had made arrangements with another bank to refinance the loan, but that Frank stepped into the picture and agreed

that he would advance the money to pay off the bank, and charge no interest; that pursuant to this agreement Frank paid the bank and Walter gave to Frank the instrument which appears to be a deed, but which Walter contends is a mortgage. Walter also maintains that he was to repay Frank on or before some time in 1928, and, as evidence of the agreement that Frank would reconvey the property to Walter upon payment of the debt, Frank executed and delivered a "bond for title," which provided for a reconveyance of the property when the debt was paid; that later, the bond for title was destroyed when the house burned. Walter further contends that, in any event, since the year 1938 he has held the property by adverse possession and has acquired title in that manner.

Frank contends that in 1923 his father approached him with the proposition of paying the bank and taking up the mortgage to prevent a foreclosure; that the property was not worth more than the amount owed on it; that he refused to go along on that proposition but, later, he did agree to buy the property outright and let Walter and his family continue to live there until such time as Frank might decide to sell the place. He says the instrument in question is what it purports to be — a straight-out warranty deed with no strings attached — and that he executed no bond for title. Frank further says that at no time since he purchased the property has it been called to his attention that Walter claimed to own the place.

The record consists of over 480 pages and it would be impractical here to abstract all of the testimony. Frank and Walter testified, as above indicated. In addition, Walter stoutly maintains that his use of the property has been such as to be wholly inconsistent with anything other than ownership and is, therefore, strong circumstantial evidence corroborating his version of the transaction. His former wife corroborates him in saying that Frank executed a bond for title, however, she says that there was no due date of any money owed, whereas Walter says the bond for title provided the debt was to be paid by 1928. In addition, Walter pro-

.duced evidence to the effect that he has rented some of the land to others. But, it is not uncommon for a tenant to sublet farming land. He produced evidence of the fact that on numerous occasions he sold timber from the land, but Frank testified that on one occasion Walter sold timber from the land in the sum of $1,108 and spent the money; and, since he could not deliver title to the timber, Frank had to go to his rescue and repay the $1,108 to the lumber company. Walter testified that he executed a lease to Calgo Oil Company and took a draft to pay Frank, but that the deal failed because Frank would not accept the money. But this testimony does not appear to corroborate Walter, for if Frank held only a mortgage Walter could have compelled him to accept the money. The house on the property was destroyed by fire and Walter, with the help of his neighbors, rebuilt it; but Frank furnished the material. Walter built fences and a small barn; he also constructed a water pond, but he used the property for many years without the payment of anything, even the taxes. There is conflict in the testimony as to who paid the taxes on the property for the first two years after the transaction between the parties, but there is no dispute about the fact that subsequent to the two year period Frank paid the taxes; this was for a period of about thirty years. Walter places great emphasis on the fact that in 1926 he executed a right-of-way deed to the Magnolia Pipe Line Company; but it is shown that Frank had no knowledge that such a deed had been executed until 1938, at which time the matter was taken up with Walter and he executed a disclaimer, or quittance, of any interest in the property.

Walter testified that in 1928 he had an opportunity to sell the timber for $2,800, which would have enabled him to pay the alleged mortgage, but that Frank talked him out of making the sale because the timber was worth more. Walter says that on another occasion he had an opportunity to get $26,000 for an oil and gas lease, but that Frank took over the negotiations and agreed that if he failed to consummate the lease he would pay to Walter $1,500. No lease was effected; Frank did not pay $1,500,

and Walter took no action. Walter says on another occasion he had a deal whereby he was to get $60,000 for a lease; that the $60,000 was put in escrow but Frank would not sign a quitclaim deed and hence the deal fell through. Again, Walter took no action to compel Frank to accept payment of the alleged mortgage indebtedness. Walter testified that on another occasion he was offered $500 per acre for the land; this would have amounted to $110,000, and Frank offered to sign a deed for $7,500, but when arrangement was made to pay the $7,500, Frank refused it. Walter took no action to compel Frank to accept payment of the alleged debt. Next, Walter says Frank offered to give a deed for the consideration of $1,000 per acre, but when an offer of $1,000 per acre was made — a total of $220,000 — Frank would not go through with the deal; and yet Walter did nothing to compel the acceptance of payment of the alleged mortgage, or to establish his alleged title until years later, after oil was discovered on the property. During all the time these alleged offers were made, Walter was a poor man in bad financial circumstances. If he testified truthfully about the alleged offers, the fact that he took no action to compel Frank to convey the property is entirely convincing that he knew Frank owned the property and could not be compelled to convey it. On the other hand, if Walter falsified about such alleged offers, his entire testimony is discredited, and it cannot be said he has proved his case by clear, cogent and convincing evidence. When Frank received the deed in 1923, he promptly recorded it, and thereafter he was the record owner. He states, however, that no one approached him about a lease until the year 1954, when he executed a lease to the Lawton Oil Company.

As to the point on adverse possession: Since it is being held that Walter is a grantor in possession, notice of the hostility of his claim must have been given to Frank before Walter could prevail on that point. "Where a vendor, after having executed a deed, remains in possession of the premises conveyed, he is presumed to hold in subordination to the title conveyed, unless there is affirmative evidence of a contrary intention;

and, where his occupancy and use are not manifestly inconsistent with the right of his grantee, notice of the hostility of his claim must in some way be brought home to his grantee before the statute of limitations will begin to run." *Stuttgart* v. *John,* 85 Ark. 520, 109 S. W. 541. "The rule is well established that 'retention of the possession of vendors after the execution and delivery of a deed is presumed to be in subordination of the title conveyed and the statute of limitations will not begin to run until notice of the hostility of their claim is actually given to the grantee.' " *Franklin* v. *Hempstead County Hunting Club,* 216 Ark. 927, 228 S. W. 2d 65.

The evidence is convincing that the only notice Frank ever had that Walter might be claiming to be the owner was in 1938. At that time, Frank was having the abstract examined with the view of negotiating an oil and gas lease. The abstract revealed that in 1926 Walter had given a right-of-way deed to the Magnolia Pipe Line Company. Walter was contacted about the matter; he went to the office of Frank's attorney and executed a disclaimer of any interest in the property. In the face of such circumstances it cannot be said that Walter was holding the property adversely. It does not appear that subsequent to the execution of the disclaimer Frank received any notice of adverse holding on the part of Walter.

Affirmed.

The Chief Justice and Justice MILLWEE dissent; Justice McFADDIN concurs.