Argued November 13, affirmed as modified December 30, 1959

REID et al *v.* REID

348 P. 2d 29

502

*Orval Thompson* and *H. M. Weatherford* argued the cause for appellant. On the briefs were Weatherford and Thompson, Albany.

*H. W. Devlin* argued the cause for respondents. On the brief were Cummins & Devlin and Marsh, Marsh & Dashney, McMinnville.

Before McAllister, Chief Justice, and Perry, O'Connell and Redding, Justices.

REDDING, J., (Pro Tempore)

This is a suit by the plaintiffs to have it decreed that they are the owners in fee simple of a 78-acre tract of farm land located near Dayton, in Yamhill County. From a decree in favor of the plaintiffs, the defendant has taken this appeal.

The plaintiffs seek the relief prayed for in their complaint on two theories. In their first cause of suit plaintiffs allege that the execution and delivery of the deed of February 7, 1925, hereinafter referred to, from their parents, Clair Reid and Verda Reid, to Clifford F. Reid was conditioned upon an agreement that said grantee could regain title to said real property upon payment to Clair J. Reid of the sum of approximately $6,000, advanced by said grantors in discharge of certain liens on said property. Clifford F. Reid having wholly failed to fulfill said condition within a reasonable time, plaintiffs ask that said deed be cancelled and removed as a cloud on the title of the real property which is the subject of this suit. In their second cause of suit the plaintiffs allege that they are entitled to the real property in question by virtue of adverse possession thereof.

At the conclusion of the plaintiffs' case upon plaintiffs' first cause of suit the trial court, upon motion of defendant, dismissed said suit upon said first cause.

The trial then proceeded upon plaintiffs' second cause of suit. At the conclusion of the trial the court found that the plaintiffs had gained title to the real property in question by adverse possession and granted plaintiffs the relief prayed for in their complaint. The defendant, Ella Reid, individually and as executrix of the estate of Clifford F. Reid, in her appeal from the judgment and decree of the lower court, contends that Clifford F. Reid acquired title to the property in question from Clair J. Reid and Verda Reid by deed dated February 7, 1925.

During the year 1912, Clifford Reid and his wife, the defendant, Ella Reid, purchased the land in question herein and thereafter operated it as a dairy farm, while living in Portland, where Clifford was engaged in business. The land purchased was situated adjacent to the home place then owned by James and Mary Reid, parents of Clifford and Clair Reid, and operated by Clair Reid as a grain farm.

In September, 1923, the defendant and her husband, Clifford F. Reid, moved to Los Angeles, California, and subsequent thereto and upon their first return to Oregon, Clifford rented the property in question to Clair. In the words of the defendant: "Clair was to run the ranch, take care of the ranch, pay the taxes, and to have the out-put of the farm."

Subsequent to said rental and on the 10th of October, 1924, without consideration so far as the record shows, except for a recital in the deed of payment of $10, Clifford F. Reid and Ella L. Reid, his wife, deeded the property in issue to Clair J. Reid and Verda Reid, his wife. After receipt of such deed Clair J. Reid and Verda Reid borrowed monies from the United States National Bank of McMinnville, with which they paid an existing and matured mortgage on the property in the principal sum of $4,800, together with accrued

interest, and also paid an unsatisfied judgment against Clifford F. Reid in the approximate sum of $1,500 which was a lien on the property; acquired several quitclaim deeds to clear the title to the property; thereafter placed a mortgage on the property in favor of the Federal Land Bank to secure a loan in the sum of $5,000; and thereafter and on February 7, 1925, executed a warranty deed in favor of Clifford F. Reid which they mailed to said grantee on February 9, 1925, at his Los Angeles office and in which they warranted said property to be free and clear of all encumbrance. There is no evidence of any consideration having been paid for said deed, except for the recital in said instrument. Subsequent thereto said grantors sold a silo located on the premises and with the approval of Clifford converted a dairy barn located thereon to a turkey brooder house, and after discussing the matter with Clifford, Clair tiled the property for drainage purposes. Clair also caused a survey of one line to be run; sold growing timber from the property, and mortgaged said property for a second time.

For purposes of securing credit, Clair Reid listed the 78 acres in question among his assets in at least 12 annual financial statements filed with the United States National Bank of McMinnville from October 18, 1925, to April 23, 1941.

Clifford Reid and the defendant continued to live in the vicinity of Los Angeles, California, and were present in Oregon only on short visits. The plaintiffs' parents, Clair and Verda Reid, remained in Oregon and in possession of the land in dispute until the time of their demise. Clair Reid, his wife Verda Reid, and the plaintiffs herein have continuously farmed the land in question since Clair was placed in charge of the land when Clifford moved to California in 1923 and have at all times, except for vacations, resided on the home

place adjoining said property. No rental whatever has been paid to or demanded by Clifford Reid, except that plaintiffs and their parents, now deceased, have at all times since 1923 to date paid the real property taxes on the property and the premiums on the fire insurance policies covering the improvements located thereon.

Clifford Reid and his brother Clair were exceedingly friendly; each bore toward the other a deep and genuine affection at all times. The defendant testified in this regard as follows:

"Q What was the relationship that existed between these two brothers?

"A Very close relationship. The [sic] thought a great deal of each other.

"Q Can you describe Clifford's attitude toward Clair?

"A He would have done anything for him.

"Q What do you mean by that?

"A Give him anything—help him in any way possible. He thought more of him than I have ever known a man to man [sic] to think of a brother.

"Q What was Clair's attitude or feeling toward Clifford?

"A Same way—just the same.

"* * * * *

"Q What was Clair's attitude and feeling toward Clifford?

"A Never anything but the closest love for him.

"Q Did this mutual feeling between the brothers—how long did it continue?

"A Years.

"Q Did it continue until the time of Clair's death?

"A Yes."

After becoming established in California, Clifford was very successful in his business enterprises and was generous in many ways with Clair and the members of Clair's family.

Clair died in 1944, and his widow Verda thereafter, by written instrument, leased the 78 acres in question, together with the home place, on a year to year basis, to her son Norman, one of the plaintiffs herein. This lease arrangement continued until her death in 1953.

Norman Reid, having been advised in 1937 and again in 1940 by his father that Clifford held a deed to the 78 acres, made a trip to Los Angeles in January, 1954, after his mother's death in quest of a quitclaim deed from Clifford to clear the title to the property, which he considered an asset of his mother's estate. Because of the condition of Clifford's health, Clifford having suffered a serious heart attack shortly prior thereto, Norman at the suggestion of the defendant refrained from discussing with Clifford the subject of the quitclaim deed. The deed was left with the defendant, but nothing was ever heard from Clifford with reference thereto. Subsequently and on October 1, 1954, the deed of February 7, 1925, from Clair Reid and Verda Reid to Clifford Reid was received by mail for recording by the county clerk of Yamhill County. Clifford passed away on June 3, 1955, leaving defendant Ella L. Reid surviving him.

 Under the undisputed facts of this case it would appear that plaintiffs' contention that they are entitled to the property on the basis of adverse possession is untenable. As the court in its opinion in *Irby v. Irby*, 226 Ark 969, 295 SW2d 634, points out:

"'* * * Where a vendor, after having executed a deed, remains in possession of the premises conveyed, he is presumed to hold in subordination to the title conveyed unless there is affirmative evi-

dence of a contrary intention; and, where his occupancy and use are not manifestly inconsistent with the right of his grantee, notice of the hostility of his claim must in some way be brought home to his grantee before the statute of limitations will begin to run.' Stuttgart v. John, 85 Ark. 520, 109 S.W. 541, 543. 'The rule is well established that "retention of the possession of vendors after the execution and delivery of a deed is presumed to be in subordination of the title conveyed and the statute of limitations will not begin to run until notice of the hostility of their claim is actually given to the grantee."' Franklin v. Hempstead County Hunting Club, 216 Ark. 927, 228 S.W.2d 65, 67."

This court in *Sertic v. Roberts*, 171 Or 121, 136 P2d 248, in holding that adverse possession depends upon the occupant's intention to claim and hold in opposition to all the world has said:

"* * * If, at the time one enters, or afterward, he does not claim the title himself, but acknowledges title of another, his possession must be taken as an entry or holding in subordination to the title of the person whose right he acknowledges. [Citing cases.]"

Evidence that Clair's possession of the property was hostile to the rights of Clifford is lacking. Indeed, the converse is true. In this regard the evidence shows that sometime subsequent to the execution and delivery of the deed of February 7, 1925, Clair conferred with Clifford with regard to converting the dairy barn into a turkey brooder house. In 1939 Clair and Verda visited Clifford at his home in Los Angeles and talked with Clifford about tiling the property. While the record is silent on such matters as the sale of a silo located on the property and the sale of growing timber thereon, it must be remembered that long prior to the filing of this suit the lips of Clifford, Clair and Verda were sealed by death. They were the only persons who

would have personal knowledge of the agreement or understanding of the parties concerning all such matters, and in view of the unquestioned character of both Clair and Clifford and their deep affection and high regard for one another, one examining the record herein is left with an abiding conviction that what was done by Clair with reference to the farm was acceptable to Clifford and in no respect hostile to his rights. This view is supported by direct evidence concerning an occurrence in 1945 at the grave of Clair. The defendant testified as follows:

"Q Did you later have a conversation with Verda after Clair had passed away?
"A I did.

"Q Where did that conversation take place?
"A At the cemetery—at his grave.

"Q When was that?
"A He died in 1944. I think it was in 1945—after he died but not too long and Verda had just moved to town a little while.

"Q And what was the occasion—why were you and Clifford in Oregon?
"A We just went up to see them.

"Q Now, who was present at the cemetery?
"A Clifford, Verda and I.

"Q What did Verda say relative to the 78 acre tract, if anything?
"A She asked if I knew what Clifford wanted to about it. [sic] I said that I didn't know and that she should ask Clifford.

"Q Did she ask Clifford?
"A She asked Clifford.

"Q Relate the conversation that took place?
"A Clifford had not been up—had not seen the grave before. He went over and stood at the grave and came back in a little while and they talked in front of the car, and she asked Clifford what he

wanted to do about our ranch, and I couldn't hear all he said about it, but he told her—

"MR. DEVLIN: Just a minute did you hear what was said?

"WITNESS: I heard most of it but not all.

"MR. THOMPSON: You may tell what you heard.

"A Go ahead like you always have and they had said something before that but I don't know what that was."

This testimony was uncontradicted and indicates that Verda was well aware that Clifford had an interest in the 78 acres and that her deceased husband Clair had no design to claim adversely to Clifford, a brother whom he dearly loved. Verda undoubtedly knew fully the understanding between the two brothers. Unlike the widow of the business tycoon who frequently has little or no knowledge of the details of the business affairs of her deceased husband, Verda, the widow of a farmer to whom payment of rent, payment of taxes, payment of insurance premiums, and particularly payment of mortgage installments are matters not only of constant concern, but frequently of worry to the wife, as well as to the husband, undoubtedly knew in detail why no rent had been paid to Clifford for more than 20 years and why Clair during his lifetime, and she after his death, paid the taxes and the fire insurance premiums on the property.

It would thus appear that if the decree of the lower court in favor of plaintiffs is to be sustained, it must be sustained under the allegations contained in plaintiffs' first cause of suit. The plaintiffs not having appealed from the lower court's ruling adverse to them on their first cause of suit, defendant contends that the lower court's ruling thereon is not subject to review by this court. This contention is without merit.

The authorities on which the defendant relies merely support the doctrine that a respondent who does not cross appeal is not entitled on an appeal taken by the adverse party to a decree more favorable than that which was obtained by the respondent in the lower court. In the instant case plaintiffs prevailed on their second cause of suit and obtained a decree in which they were awarded relief which was as full and complete as they would have been entitled to had they prevailed on their first cause of suit as well as upon their second cause. The rule applicable here is announced in the case of *Mott v. Horstmann,* 36 Cal2d 388, 224 P2d 11, wherein the court said:

"This court has reiterated the general rule relied on by the petitioner by stating that 'It is well settled that parties who have not appealed cannot attack the findings [and that] the only objections thereto which can be received being those urged by the appellant.' Henigson v. Bank of America, 1948, 32 Cal.2d 240, 244, 195 P.2d 777, 779. Also that '* * * on appeal errors affecting a party who does not appeal will not be reviewed, even though excepted to by him in the trial court and included in the bill of exceptions.' Salter v. Ulrich, 1943, 22 Cal.2d 263, 268, 138 P.2d 7, 9, 146 A.L.R. 1344.

"Notwithstanding the foregoing rule the respondent contends that on the record presented on this appeal the rule relied upon by the petitioner should not be applied; that this is a mandamus proceeding and the judgment is merely that the petitioner take nothing and that the peremptory writ be denied; that the judgment was entirely in favor of the respondent and that there is nothing in it from which he could appeal. He therefore invokes the doctrine that the judgment denying the writ should stand if upon any tenable legal theory it may be sustained by the record. In other words, he insists that an erroneous reason should be disregarded if the decision is correct. See Sears v. Rule, 1945, 27 Cal.2d 131, 140, 163 P.2d 443; People

v. Central Pac. R. R. Co., 76 Cal. 29, 43, 18 P. 90; 2 Cal. Jur. p. 808, sec. 476; 1 Cal. Jur. 10-yr. Supp., p. 494; 1949 Secondary Pocket Part, p. 188. Under these circumstances the merits of the respondent's position will be examined."

In 5 CJS, Appeal and Error 847-849, § 1498(3), the rule is stated as follows:

"While the successful party at the trial has been held not injured by errors committed against him and therefore not entitled to complain of them, in some jurisdictions when the whole record is carried up on appeal appellee is permitted to present and urge exceptions taken by him below for the purpose of sustaining his judgment, or of demonstrating that the appellant is not entitled to the relief he seeks at the hands of the appellate court notwithstanding the errors committed against him at the trial, and, without a cross appeal, he may urge in support of the order or judgment under review any sound reason for affirmance, even though it is not the one assigned by the trial judge for his decision."

In 3 Am Jur, Appeal and Error 403-405, § 866, the rule is stated thus:

"Although in some jurisdictions an appeal in chancery opens up the entire case for the appellees as well as for the appellants, as a general rule, the appellee or defendant in error who has not appealed or sued out a writ of error cannot assign error, the right to assign errors being restricted to the appellant or plaintiff in error. In finally disposing of the case, however, the court may sometimes look to the rulings of the court below which were objected to by the appellee, and the appellee may urge in support of the decree any matter appearing in the record, though the question of the validity of the judgment or decree as against him will not be considered, nor will the case be reversed for his benefit where he has not sought a review."

See also *Maricopa County v. Corporation Commission of Ariz.*, 79 Ariz 307, 289 P2d 183; *City of Glendale v.*

*Crescenta Mutual Water Co.,* 135 Cal App2d 784; 288 P2d 105; *Oppenheimer v. Cassidy,* 345 Ill App 212, 102 NE2d 678; *McMinimee v. McMinimee,* 238 Iowa 1286, 30 NW2d 106; *Burns v. Rodman,* 342 Mich 410, 70 NW2d 793; *Nesbitt v. Marton,* 126 Misc 203, 213 NYS 211; *Burt v. Heikkala,* 44 Wash2d 52, 265 P2d 280; *Pargeter v. Chicago & N.W.R. Co.,* 264 Wis 250, 60 NW2d 81.

The lower court in its decree, having found for the plaintiffs, we hold that plaintiffs upon this appeal may urge in support of said decree any sound reason for affirmance, even though it is not one assigned by the trial judge for his decision.

That Clair was in possession of the subject property as the tenant of Clifford prior to and at the time of the conveyance to him, there can be no question. In this connection the defendant testified:

"Q After the herd was sold off, who operated the 78 acres?

"A Well, they didn't do very much that fall. We moved in September and then Clair took over. Clifford told Clair to take over until we got things straightened around.

"Q Under what—who operated the place after you went to California?

"MR. DEVLIN: First, would you establish her knowledge about the operation and who operated it before.

"Q Do you know who operated the 78 acres after you moved to California?

"A Our herdsman stayed there until our cattle were gone.

"Q After the cattle were gone, then do you know who operated it?

"A I do not think anybody lived in the house, but Clair just farmed it and took care of things.

"Q When did Clair start farming the 78 acres?

"A The next time that we were up, Clair and Clifford talked over what they were going to do—

"* * * * *

"Q And who was present at that time?

"A Clifford and Clair and me and maybe Verda Reid.

"Q What was said between Clifford and Clair?

"A Clair was to run the ranch, take care of the ranch, pay the taxes, and to have all the out-put of that farm for doing it.

"Q Now, after that date, did Clifford deed the 78 acres to Clair?

"A Yes, he deeded the 78 acres to Clair."

■■ One who has no interest in mortgaged property and who voluntarily pays the debt of another secured by a mortgage thereon is not entitled to subrogation. It is clear from the above-quoted testimony of the defendant that on October 10, 1924, Clair Reid was farming the land in question on a year to year tenancy. As rental he was to pay the taxes and insurance and care for the farm. The record is silent as to whether as of said date Clair had farm crops planted on the land, or whether he had paid the annual rental in advance by paying the taxes for the entire year, the first half of which were due on April 5, and the second half of which were due on October 5. Even in the absence of such evidence it is obvious that a tenant from year to year in possession of farm property has a valid and subsisting interest in the land so rented and being farmed. Is such interest sufficient to justify the tenant in paying a debt which is a lien on the property being farmed, that his interest therein might be protected?

In 50 Am Jur, Subrogation 699, § 23, the general rule is stated as follows:

"* * * The extent or quantity of the subrogee's interest which is in jeopardy is not material. If

he has any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could. It would seem that one acting in good faith in making his payment, and under a reasonable belief that it is necessary to his protection, is entitled to subrogation, even though it turns out that he had no interest to protect."

The following statement of the general rule is to be found in 83 CJS, Subrogation 604, § 9:

"Subrogation will arise in favor of those who act under the necessity of self-protection. One who pays another's debt to protect his own rights and interests, or who pays another's debt in order to protect some interest which he represents, is not ordinarily considered a volunteer and may be subrogated to the creditor's rights. Likewise, one who has an interest which is jeopardized by the continued existence of the debt of another is not a volunteer in paying that debt, and he may obtain subrogation."

In *Isselstein v. Steinberger*, 106 Wash 294, 179 P 855, where a wife made payments on a mortgage which her husband placed on his individual property prior to marriage, the court said:

"* * * Whether the interest of Mrs. Isselstein in the land at that time was in law a community interest we need not now consider, further than to say that her husband owned the land as separate property, that she was living upon the land, and certainly had some interest or expectancy therein. We are satisfied that she was justified in making the payment of $600 upon the mortgage in order to protect whatever interest or expectancy she had, and that in equity and justice she should be subrogated to the rights of the original mortgagee to the extent of that payment."

Also see *Katschor v. Ley et al.*, 153 Kan 569, 113 P2d 127.

Mr. Justice SLOAN, speaking for this court in *United Pacific Insurance Co. v. Schetky Equipment Co.*, quoted with approval from *Bater v. Cleaver*, 114 NJL 346, 176 A 889, 892, as follows:

"Subrogation 'is a remedy which is highly favored. The courts are inclined to expand rather than to restrict the principle. Although formerly the right was limited to the transactions between principals and sureties, it is now broad and expansive, and has a very liberal application * * * the principal being modified to meet the circumstances of the individual case.' "

We hold that Clair Reid was justified in extinguishing the unsatisfied judgment against Clifford which was then a lien against the property, and was likewise justified in paying the mortgage held by B. A. Kliks, which was then due and subject to foreclosure.

October 10, 1924, the day on which Clifford deeded the 78 acres in question to Clair was indeed an ominous day for Clifford, for his estate in said land was in jeopardy and he required approximately $6,000 on that very day to prevent foreclosure and avoid continued personal liability on a judgment which was then a lien on said property and avoid a possible resulting deficiency judgment should foreclosure proceedings be instituted. Clair Reid's interest in said property as a tenant was likewise in peril, for a foreclosure would extinguish any interest he had in the property or in the crops, if any, then growing thereon.

With his mother as cosigner, Clair Reid's credit at that time was such as to permit him to obtain a short-time commercial loan from the United States National Bank in McMinnville in a sum sufficient to enable him to satisfy both the mortgage and the judgment. It appears that Clair's financial circumstances rendered it impossible for him to secure long-term financing sufficient to protect his interest in said land without

the use of said 78-acre tract for purposes of collateral security.

We conclude from a most careful consideration of the record in its entirety that the deed from Clifford Reid and wife to Clair Reid and wife, covering the 78-acre tract in question, which was dated October 10, 1924, and recorded October 18, 1924, and the reconveyance thereof from Clair Reid and wife to Clifford Reid dated February 7, 1925, which deed was mailed to said grantee on February 9, 1925, and not recorded until October 1, 1954, together with the Federal Farm Loan Amortization Mortgage covering the same property from Clair Reid and wife to the Federal Land Bank dated January 2, 1925, and recorded February 24, 1925, were all part of the same transaction and constituted the method adopted by the parties to enable Clair to use said land as collateral security. We consider it fair to infer that Clifford refrained from recording said deed because of uncertainty as to when he would repay Clair the monies which Clair advanced in his behalf and a desire on Clifford's part that Clair continue to enjoy the privilege of using said lands for collateral security for future borrowings, whether required by Clair in making the installment payments of principal and interest under said installment mortgage for which Clair was personally liable or otherwise.

The conclusion reached by this court as above stated finds direct support in the following testimony of defendant:

"Q I hand you defendant's Exhibit B-1 and B-2 marked for identification and ask you what those documents are?

"A It is the deed they gave to us in 1925.

"Q And B-2—what is that fastened on the back of it?

"A B-2 is the envelope it came in.

"* * * * *

"Q (Mr. Thompson continuing) Mrs. Reid, I notice that this deed, defendant's Exhibit B-1, was not recorded until 1954. Do you know why the delay in the recording of the deed?

"\* \* \* \* \*

"Q Do you have any knowledge, other than the conversation with Clifford you were about to relate, do you have any knowledge why it was not recorded?

"A So that Clair could borrow money on it."

As generous as he was with his brother Clair, Clifford Reid certainly must have recognized an obligation to repay his brother Clair for the advances which Clair made in his behalf and appreciating such financial assistance so extended in a time of need, Clifford desired to make it possible at all times for Clair to borrow on the land until such time as he, Clifford, repaid Clair. This desire on Clifford's part as testified to by his widow would have been impossible of fulfillment without the deed of October 10, coupled with Clifford's election to withhold recording the reconveyance. The record offers no other explanation for the conveyance and the reconveyance.

We hold that in equity and justice Clair Reid and his successors in interest should be subrogated to the rights of the mortgagee under the B. A. Kliks mortgage, as well as to the rights of Clifford Reid's judgment creditor.

While the plaintiffs in their complaint did not expressly seek relief on the doctrine of subrogation, we hold that such relief may properly be given under the allegations of the pleadings. *Ruth et ux. v. Von Hickman*, 214 Or 490, 330 P2d 722, and cases cited thereunder.

While the statute of limitations would appear to bar the plaintiffs' right to affirmative relief as prayed for in her complaint, such is not true of the plaintiffs'

right to be subrogated. 36 Am Jur, Mortgages 824, § 268, states the general rule as follows:

> "The rule that a mortgee lawfully in possession, or one entitled to the rights of a mortgagee so in possession, has the right to retain the possession of the mortgaged premises until the mortgage debt is paid prevails although an action on the debt, or a suit to foreclose the mortgage, is barred by the statute of limitations."

Also see *Caro v. Wollenberg*, 68 Or 420, 136 P 866.

■ We are not unmindful that ordinarily a mortgagee in possession has a responsibility to account for the reasonable value of the use and occupancy of the mortgaged premises during his possession thereof. *Berns v. Berns*, 125 Or 682, 687, 267 P 1033. In the instant case, however, an accounting would not appear to be called for, in that we have clear and convincing evidence from the defendant as to an agreement between Clifford and Clair in which the rental was expressly fixed. In this regard the defendant testified: "Clair was to run the ranch, take care of the ranch, pay the taxes, and to have the out-put of the farm."

That it was the intention of the parties that this same rental arrangement was to continue after the exchange of deeds likewise finds support in the testimony of the defendant. The real property taxes on the property for the years 1932, 1955-56 and 1956-57, the only years for which we find information in the record, averaged in excess of $400 per year. The defendant in her testimony quoted both Clair and Verda as having stated they were getting cheap rent. Clair and Verda knew what the rental arrangement was when they made the statements attributed to them. It is fair to assume from what is disclosed by the record that raising grain crops was the highest and best use to which this land could be put. During the depression,

at least, and the statements concerning cheap rent attributed to Clair and Verda were made in that period, anything in excess of $400 per year would scarcely appear to be cheap rental for 78 acres of valley farm land for use in growing grain crops. This is especially true when it is remembered that the property had no residence on it. In this connection it should be noted that the defendant testified that Clifford, when visiting Clair's grave shortly after Clair's death in 1944 in answer to an inquiry from Clair's widow Verda as to what he wanted to do about his ranch, answered: "Go ahead as you always have * * *."

The defendant in her cross-complaint prays that she be decreed the owner in fee simple of the land in question, free and clear of any and all claims of the plaintiffs and of all persons claiming by, through, or under them. This, we think, the defendant is entitled to; conditioned, however, upon her payment to plaintiffs of all monies advanced by Clair J. Reid in satisfaction of the Kliks mortgage and in satisfaction of the judgment which constituted a lien on the property on October 10, 1924, together with interest upon said monies so advanced. Should defendant fail, within 30 days from the entry of the mandate of this court, to file in the circuit court amended pleadings offering to redeem said land by paying all monies hereinabove found to be due plaintiffs, the defendant's cross-complaint, as well as the plaintiffs' complaint, should be dismissed. The plaintiffs being in possession may maintain such possession as against the defendant until payment is made. *Caro v. Wollenberg*, supra.

The decree of the circuit court is modified and the cause remanded for further proceedings. Neither party is to recover costs.