Torkel S. TORGERSON and Marie Torgerson, Plaintiffs and Appellees,

v.

Torkel S. ROSE, as Personal Representative of the Estate of Anne E. Rose, also known as Anna Torgerson Rose, deceased, and Terryl A. Snow, Defendants and Appellants,

and

Dennis R. Rose, Charlotte G. Kent, Torkel S. Rose, and All other persons unknown claiming any estate or interest in or lien or encumbrance upon the property described in the complaint, Defendants.

Civ. No. 10376.

Supreme Court of North Dakota.

Oct. 3, 1983.

Maureen White Eagle, of Foughty, Christianson & Thompson, Devils Lake, for plaintiffs and appellees.

J. Thomas Traynor, Jr., of Traynor, Rutten & Traynor (on brief), Devils Lake, for defendants and appellants.

VANDE WALLE, Justice.

This is an appeal by Torkel S. Rose and Terryl A. Snow from a district court judgment quieting title to a parcel of land in Rolette County in Torkel S. Torgerson [1] and Marie Torgerson. We affirm.

Torkel S. Torgerson and his sister, Anna Torgerson Rose, grew up in the Rolette area on the family farm. At all pertinent times, the brother and sister relationship between the two was cordial and very close. Following their parents' deaths, Torkel and Anna became owners of the farm, and by mutual agreement, Torkel was allowed to farm the original farmstead.

Torkel subsequently purchased approximately 156 acres of land,[2] which is the subject matter of this litigation, from Wilfred Wells Budd by a warranty deed dated July 2, 1941. The deed was duly recorded on September 19, 1941. Torkel had leased and farmed this land, which is located near the family farm but is not part of the lands originally owned by the parents of Torkel and Anna, for two or three years prior to the purchase. Torkel borrowed

---

1. In its memorandum decision, the trial court noted that Torkel S. Torgerson died after the trial while the case was under advisement. The trial court suggested substitution of parties pursuant to Rule 25 of the North Dakota Rules of Civil Procedure, but the record reflects that this has not been accomplished. The appellants raise no issue regarding this situation.

In any event, Marie Torgerson survives as a joint tenant and remains a party in interest. We thus consider her as the appellee in this case.

2. The parcel of land is described in the July 2, 1941, deed as:

"East One-Half Southwest Quarter (E½SW¼) and Lots Three (3) and Four (4) of Section Eighteen (18), Township One Hundred Sixty (160), Range Seventy (70), containing One Hundred Fifty-Five 78/100 (155.-78) acres more or less, according to the government survey thereof; ..."

Wagon tracks left by the father of Torkel and Anna, who years ago had transported mail by horse and wagon, still exist across this land.

$100 from Anna which he applied to the $700 purchase price of the land, but later repaid the loan. In turn, Anna used Torkel's checking account for her banking activities. Following his purchase of the property, Torkel fenced in the land.

On November 17, 1943, Torkel married Marie Torgerson. Anna also married, and in 1947, she and her husband, Ray Rose, moved to Oregon with their family. Each year, the Rose family returned to the Rolette area for a short period of time to assist Torkel and Marie in their harvesting and farming operations. No payments were ever accepted for their help. Torkel continued to farm the parcel until October 1966, when he lost his eyesight.

When Torkel became blind, one of Anna's sons, Dennis R. Rose, returned to North Dakota at Anna's request to help Torkel and Marie, who have no children, complete the 1966 fall farm work. Dennis left the farm briefly when his father, Ray, died on October 23, 1966, but he returned during the winter to help with the chores, and again with his brother, Torkel S. "Bud" Rose, in the spring of 1967 to seed, and later in the summer to harvest, the crop.

Since 1968, Kermit Knudson has, with one exception, continuously farmed the disputed property as a tenant. For a short period during the early 1970s, Bud attempted to farm the land. Conflicting testimony indicates that, at the time, Bud was interested in either purchasing Torkel's interest in the farm or renting the land. Bud and Anna, however, returned to Oregon after having spent only two weeks at the farm and Knudson once again was listed as operator of the farm in the records of the County Agriculture Stabilization and Conservation Service Office.

Following Torkel's acquisition of the parcel of land in 1941, and after his marriage to Marie, the couple paid all real estate taxes and paid for all upkeep of the property. They continuously maintained possession of the property, farmed the parcel, and retained all the profits from its operation. During the entire period, wheat-acreage reduction payments were divided between the Torgersons and Knudson according to the share percentage of their lease. In 1949 and 1964, Torkel and Marie executed oil leases covering the land and in 1966 they also executed a wetlands lease for a consideration of $1,100. Torkel and Marie never asked Anna to share in payment of any farming costs, upkeep, or taxes, nor did Anna contribute to the payment of such expenses. Anna never attempted to supervise farming activities concerning the land nor did she demand a share of the farm income, leasing income, or rent, or demand that she be given possession of the premises. On one occasion, when grain prices were favorable, Torkel sent Anna a check for $750 as a Christmas present along with a note stating that he wanted to show her what 100 bushels of durum were worth. Anna did not cash the check and sent it back to Torkel.

On March 30, 1980, Anna died in Oregon. While going through Anna's possessions following her death, Bud discovered an unrecorded warranty deed dated May 9, 1944. This deed, allegedly signed by Torkel and Marie, conveyed the disputed parcel of land in this case to Anna in consideration of the sum of "One Dollar and other good, valueable [sic] and sufficient considerations." Also discovered among Anna's possessions was the July 2, 1941, warranty deed by which Wilfred Wells Budd originally conveyed the property to Torkel. Bud, the personal representative of his mother's estate, then had the May 9, 1944, deed recorded in the office of the Register of Deeds of Rolette County on September 25, 1980. Upon learning of the recording of the deed, Torkel and Marie claimed that it was a forgery. Although Anna specifically described and devised two pieces of Oregon property in her will, no mention is made of the North Dakota property.

In a summons and complaint dated November 17, 1980, Torkel and Marie brought an action seeking to quiet title to the disputed parcel of property. They alleged that, to their knowledge, they never signed the deed and, further, that if they did sign the deed, no effective delivery of the deed

to Anna occurred. They also claimed title to the property through adverse possession. The defendants counterclaimed to have title quieted in them.

Bud, Dennis, Terryl A. Snow, and Charlotte G. Kent, who are Anna's four children and heirs to her estate, were named as defendants to the suit. In January 1981, Dennis and Charlotte assigned whatever claims they may have had to the property to Bud and Terryl, who agreed to bear all litigation expenses. Dennis and Charlotte later stipulated in writing that title to the property could be quieted in Torkel and Marie and their answers and appearances were withdrawn.

The case was tried to the court without a jury on July 27, 1982. In a memorandum opinion dated November 20, 1982, the trial court assumed for the purposes of its decision that the deed was not a forgery and that it was properly executed and delivered, but determined that Torkel and Marie had reacquired title to the property by adverse possession. Judgment quieting title in Torkel and Marie was entered by the trial court on December 6, 1982. Bud and Terryl appealed from this judgment.

The following issues are raised on appeal: (1) whether or not the doctrines of after-acquired title and estoppel by deed barred Torkel and Marie as grantors from quieting title against the grantee Anna's heirs; (2) whether or not the trial court erred in determining that Torkel and Marie held the property in question adversely to the rights of Anna; and (3) whether or not the trial court properly excluded as hearsay statements purportedly made by Anna to the effect that she owned the property in question.[3]

I

Relying upon the doctrines of after-acquired title and estoppel by deed, the appellants argue that Torkel and Marie are es-

topped from derogating or destroying their own grant by any subsequent act and therefore they cannot acquire title to the property by adverse possession.

The doctrine of after-acquired title is codified in Section 47–10–15 of the North Dakota Century Code:

"47–10–15. After-acquired title. —Where a person purports by proper instrument to grant real property in fee simple and subsequently acquires any title or claim of title thereto, the same passes by operation of law to the grantee or his successors."

■ The appellants' reliance on § 47–10–15 is misplaced. It has been stated that "[t]he doctrine of after-acquired title is one under which title to land acquired by a grantor who previously attempted to convey title to the same land which he did not then own inures automatically to the benefit of his prior grantee." *Kirby v. Holland,* 210 Neb. 711, 716, 316 N.W.2d 746, 750 (1982).

■ This is not a case in which the grantor *purported* to convey real property which he actually did not own at the time of his grant. The appellants do not dispute that Torkel owned the property in fee simple in 1944 at the time he and Marie purportedly executed the warranty deed, nor do they dispute that, assuming proper execution and delivery, the deed transferred the title to the property to Anna in fee simple. The doctrine does not stand for the proposition that any and all title or interest acquired by a grantor after his conveyance to the grantee passes to the grantee. Thus, the doctrine of after-acquired title is not applicable in this situation.

■ We also believe that the doctrine of estoppel by deed has no application to the instant case. In *Kadrmas v. Sauvageau,* 188 N.W.2d 753, 756 (N.D.1971) [quoting 31 C.J.S. *Estoppel* § 10 (1964)], our court not-

3. The parties have also raised and briefed the issue whether or not the deed dated May 9, 1944, was effectively executed and delivered. As noted earlier herein, it appears that the trial court assumed, without deciding, that the deed

was valid and effectively delivered. Because of our disposition of this appeal, we do not address this issue, but, rather, make the same assumption as did the trial court.

ed that "[e]stoppel by deed is a bar which precludes a party to a deed and his privies from asserting as against the other and his privies any right or title in derogation of the deed, or from denying the truth of any material fact asserted in it."

The general rule adopted by the vast majority of courts is that the warranty covenants in a deed will not defeat title by adverse possession and that a conveyance does not, of itself, prevent a grantor from reacquiring title by adverse possession as against his immediate and remote grantees. E.g., *Brown v. Brown,* 361 So.2d 1038 (Ala. 1978); *Steele v. Steele,* 214 Ark. 500, 216 S.W.2d 875 (1949); *Hood v. Denny,* 555 S.W.2d 337 (Mo.Ct.App.1977); *Lindl v. Ozanne,* 85 Wis.2d 424, 270 N.W.2d 249 (1978); Annot., 39 A.L.R.2d 353 (1955); 3 Am.Jur.2d, *Adverse Possession,* § 163 (1962); 2 C.J.S. *Adverse Possession* § 133(a) (1972); 5 G. Thompson, *Commentaries on the Modern Law of Real Property,* § 2548 (1979); 4 H. Tiffany, *The Law of Real Property,* § 1182 (3d ed. 1975). But see *Lewicki v. Marszalkowski,* R.I., 455 A.2d 307 (1983).

In *Lindl v. Ozanne, supra,* 85 Wis.2d at 429, 270 N.W.2d at 252, a Wisconsin appellate court observed:

"The general rule was stated a century ago in *Brinkman v. Jones,* 44 Wis. 498 (1878) where the court stated:

"There would seem to be no good reason why the possession of a grantor may not be hostile to his deed, provided it be such as to give his grantee notice that he claims in hostility to his grant; nor why such hostile possession may not ripen into an adverse and perfect title, and bar the grantee from recovering the possession under the statute of limitations. The cases last above cited decide that a grantor may hold so adversely against his grantee. We have no doubt of the justice of the rule as stated by the counsel for the respondent, when the occupation has continued but a short time after the date of the deed, or when, though continued for a longer time, it is not inconsistent

with the title purporting to be conveyed by the deed. We are, however, of the opinion that when the possession has been for a long period, the presumption of a claim of right hostile to the title granted does arise in every case where such possession is inconsistent with the rights of the grantee, and that in such case a court or jury might find the possession adverse from the nature of the possession, without proof of an express declaration on the part of the occupant that he claimed to hold in hostility to his grant. *Brinkman,* 44 Wis. at 525."

We agree with this rationale and therefore conclude that the doctrines of after-acquired title and estoppel by deed did not bar Torkel and Marie from reacquiring title to the property by adverse possession.

II

The appellants also argue that the trial court erred in determining that possession of the disputed parcel of land by Torkel and Marie was not permissive, but was adverse to the rights of Anna. The trial court in this case relied upon § 28–01–08, N.D.C.C., which provides:

"*28–01–08. Adverse possession when based upon written instrument.*—Whenever it shall appear that the occupant, or those under whom he claims, entered into the possession of premises under a claim of title exclusive of any other right, founding such claim upon a written instrument as being a conveyance of the premises in question, or upon the decree or judgment of a competent court, and that there has been a continued occupation and possession of the premises included in such instrument, decree or judgment, or of some part of such premises, under such claim for twenty years, the premises so included shall be deemed to have been held adversely."

Section 28–01–09, N.D.C.C., defines acts constituting adverse possession in pertinent part:

"*28–01–09. Acts constituting adverse possession based upon a written instrument.*—For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument or upon a judgment or decree, land shall be deemed to have been so possessed and occupied in each of the following cases:

"1. When it has been usually cultivated or improved;

"2. When it has been protected by a substantial inclosure; . . ."[4]

Our court has stated on several occasions that in order to be "adverse," the acts upon which a claimant relies must not only be actual, but also "visible, continuous, notorious, distinct, and hostile, and of such character as to unmistakably indicate an assertion of claim of exclusive ownership by the occupant." *Woodland v. Woodland,* 147 N.W.2d 590, 597 (N.D.1966). See also *Burlington Northern, Inc. v. Hall,* 322 N.W.2d 233 (N.D.1982); *Cranston v. Winters,* 238 N.W.2d 647 (N.D.1976); *Martin v. Rippel,* 152 N.W.2d 332 (N.D.1967). The burden of proving adverse possession rests with the person alleging it and must be established by clear and convincing evidence. *Burlington Northern, Inc. v. Hall, supra; Martin v. Rippel, supra.* The determination of whether or not there has been an adverse use is a question of fact which will not be set aside on appeal unless it is clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Burlington Northern, Inc. v. Hall, supra; Mohr v. Tescher,* 313 N.W.2d 737 (N.D.1981); *Backhaus v. Renschler,* 304 N.W.2d 87 (N.D. 1981).

In support of their contention that possession of the land was permissive rather than adverse, the appellants point to the generally accepted rule that "a grantor continuing in possession of property conveyed after the execution and delivery of the deed will ordinarily be presumed to be holding the property in subordination to the rights of his grantee, rather than adversely thereto." Annot., 39 A.L.R.2d, at 355; See also 3 Am.Jur.2d, *Adverse Possession;* 2 C.J.S. *Adverse Possession,* at § 132; 5 G. Thompson, *Commentaries, supra.* Furthermore, this presumption has been applied with special rigor where the parties to the conveyance enjoy a family relationship, because acts which might evidence a hostile claim as between strangers may not evidence hostility where the parties are related. Annot., 39 A.L.R.2d, at 356; 3 Am.Jur.2d, *Adverse Possession,* at § 147; 2 C.J.S. *Adverse Possession.*

However, the presumption that a grantor retaining possession of real property holds the property permissively rather than adversely against the grantee is rebuttable rather than conclusive. Permissive possession in these circumstances is presumed to continue "only until the grantor's intention to hold in his own interest and against the title conveyed is brought to the grantee's notice, either actually by a declaration to that effect, or constructively by acts so unequivocally hostile to the grantee's title as to clearly evidence the grantor's adverse claim, . . ." Annot., 39 A.L.R.2d, at 355. See also 3 Am.Jur.2d, *Adverse Possession,* at §§ 163–164; 2 C.J.S. *Adverse Possession,* at § 133.

Our court has similarly stated, albeit in a somewhat different context, that:

"Possession, which is permissive in its inception can become adverse only where there is a disclaimer of the true owner's title, or there are acts of such an unequivocal nature on the part of the user, that notice of the hostile character of the possession is brought home to the record owner." *Ellison v. Strandback,* 62 N.W.2d 95, 100 (N.D.1953).

---

4. In addition to §§ 28–01–08 and 28–01–09, N.D.C.C., § 47–06–03, N.D.C.C., provides in pertinent part:

"*47–06–03. Title to real property—Adverse possession.*—A title to real property, vested in any person who has been or hereafter shall be, either alone or including those under whom he claims, in the actual open adverse and undisputed possession of the land under such title for a period of ten years and who, either alone or including those under whom he claims, shall have paid all taxes and assessments legally levied thereon, shall be valid in law . . . ."

In its memorandum decision, the trial court stated that "[t]he circumstances and facts of this case satisfactorily rebut the presumption that the plaintiffs' possession of the parcel was permissive and the Court so finds." In support of its finding, the trial court stated:

"As earlier summarized, the plaintiffs each year cultivated the parcel, one of the statutory factors in North Dakota of adverse possession. 28–01–09 NDCC. Two oil leases were executed by the plaintiffs. A wet lands easement was given by the plaintiffs to the United States. The leases and easement were recorded which was and is notice to the world that the plaintiffs claimed ownership of the parcel and were exercising ownership rights. For thirty-nine years, the property was farmed by the plaintiffs, they retaining all rents and profits. Bud testified that he and his mother, Anna, came to North Dakota in '72 or '73 for the purpose of buying Torkel's alleged one-half interest in the farm. The one-half interest could only refer to Anna's parents' and Bud's grandparents' original farmstead because the parcel in question was never owned by them and yet there was no discussion, at least it does not appear so in the record of this trial, that Anna at that time or any other asserted a claim of ownership of the property to the plaintiffs or either of them."

■ Having carefully reviewed the unique facts and circumstances in this case, we believe the trial court's finding that the presumption was rebutted and that Torkel and Marie held the property adversely to Anna's interests is supported by the record and thus is not clearly erroneous.[5]

In support of their argument that Torkel and Marie did not hold the parcel adversely, the appellants cite *Ellison v. Strandback, supra,* and *Wehe v. Wehe,* 44 N.D. 280, 175 N.W. 366 (1919).

In *Ellison,* the court, recognizing that possession by one cotenant is consistent with record title and is presumed to be subordinate to the rights of other cotenants, determined that the plaintiffs had failed to prove hostile possession of the property because, even though some acts of the possessor were consistent with adverse possession, other acts recognized the title of fellow cotenants and were inconsistent with the possessor's claim of adverse possession.

In *Wehe,* the court concluded that a husband's claim asserted through his heirs that his continuous occupation and management of a farm, as well as the payment of the taxes after the execution of a deed to his wife constituted adverse possession was insufficient to show a claim of right adverse to or in hostility to ownership of the real property by his wife.

Besides the obvious factual distinctions between these cases and the instant case, another important distinguishing factor is that both *Ellison* and *Wehe* involved trials de novo before our court. The court in *Ellison* and *Wehe* was not limited to determining whether or not the trial court's finding as to an adverse use was clearly erroneous under Rule 52(a), N.D.R.Civ.P. We have often stated that a finding is not clearly erroneous under Rule 52(a) merely because we might have reached a different result had we tried the case.[6] *Bye v. El-*

---

**5.** We are aware, as was the trial court, that since 1966 Kermit Knudson farmed the land as a tenant. It also appears that Bud farmed the land for approximately two weeks. However, § 28–01–12, N.D.C.C., provides in relevant part:

"28–01–12. *When possession of tenant presumed to be possession of landlord.* —Whenever the relation of landlord and tenant shall have existed, the possession of the tenant shall be deemed the possession of the landlord, until the expiration of twenty years from the termination of the tenancy, or, when there has been no written lease, until the expiration of twenty years from the time of the last payment of rent, notwithstanding that such tenant may have acquired another title or may have claimed to hold adversely to his landlord. Such presumptions shall not be made after the periods herein limited."

We agree with the trial court that Bud's brief tenancy did not interrupt the exclusiveness of Torkel and Marie's possession of the land in view of the provisions of § 28–01–12, N.D.C.C.

**6.** We also note that most of the cases from other jurisdictions relied upon by the appellants involved affirmances of lower court judg-

*vick,* 336 N.W.2d 106 (N.D.1983); *Anderson v. Mooney,* 279 N.W.2d 423 (N.D.1979).

The trial court in this case found that Torkel and Marie held the parcel of land in hostility to Anna and that such was known to her. After considering the entire evidence, we are not left with a definite and firm conviction that a mistake has been made.

### III

Finally, the appellants assert that the trial court erred in excluding as hearsay their testimony that Anna had told them on various occasions that she owned the parcel of land in question. The appellants do not dispute that the statements constitute hearsay as defined in Rule 801(c), N.D.R.Ev., but argue that the statements nevertheless are admissible under one of the residual exceptions to the hearsay rule, Rule 804(b)(5), N.D.R.Ev.

We note that although the trial court in its memorandum decision did not specifically state that the Rule 804(b)(5) exception was not applicable, we assume that the trial judge is fully aware of the exceptions to the hearsay rule and that he determined Rule 804(b)(5) was not applicable in this case.

Rule 804(b)(5), N.D.R.Ev., provides:

"(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

"(5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party and to the court in writing sufficiently in advance of its offer in evidence to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

The residual hearsay exceptions were intended to be used only in "exceptional circumstances," and thus, in applying this exception to the hearsay rule, the trial court has a "considerable measure of discretion." *Huff v. White Motor Corp.,* 609 F.2d 286, 291 (7th Cir.1979).[7] In view of the

ments finding no adverse possession under the facts of the individual cases. These decisions further evince considerable appellate court deference to the findings of the trial court: "[W]e cannot say that the chancellor's finding on this issue is against the preponderance of the evidence" [*Robeson v. Hicks,* 214 Ark. 595, 599, 215 S.W.2d 1017, 1019 (1948)]; "[T]he judgment finds ample support in the record before us" [*Belli v. Bonavia,* 167 Cal.App.2d 275, 282, 334 P.2d 196, 201 (1959)]; "The trial judge had the opportunity to observe the witnesses and is in a much better position to pass upon their credibility" [*Parrish v. Minturn,* 234 Or. 475, 480, 382 P.2d 861, 864 (1963)].

The appellants also rely upon *Reid v. Reid,* 219 Or. 500, 348 P.2d 29 (1959), in which the court in essence reversed the trial court's finding that the plaintiffs, heirs of the brother of the defendant's deceased husband, had gained title to a 78-acre tract of land by adverse possession. The "undisputed facts" in *Reid,* however, revealed that the brother who occupied the farm, and whose heirs claimed the property through adverse possession, had acknowledged the other brother's ownership, had consulted him on several occasions regarding operation of the farm, and never had shown any desire to claim adversely. This is not the situation before us today.

7. Our court has often relied upon Federal Court interpretations of the Federal Rules of Evidence when our State rule of evidence does not vary in substance from its Federal counterpart. E.g., *State v. Anderson,* 336 N.W.2d 123 (N.D. 1983); *State v. Hilsman,* 333 N.W.2d 411 (N.D. 1983). Except for a slight variation in the notice provision, Rule 804(b)(5), N.D.R.Ev., is identical to Rule 804(b)(5), Fed.R.Evid.

broad discretion afforded the trial court, we cannot say that it abused its discretion in these circumstances.

The judgment is affirmed.

ERICKSTAD, C.J., PEDERSON and SAND, JJ., and PAULSON,* Surrogate Justice, concur.

---

* Justice WM. L. PAULSON served as a Surrogate Justice for this case pursuant to Section

27–17–03, N.D.C.C.